Breitel, J.
The primary issue is whether a lender who, under an unfiled assignment of accounts, receives the payments made by a general contractor to a defaulting and now insolvent subcontractor, is liable for a diversion of trust funds under the Lien Law, although the lender, simultaneously with receipt of the payments, returned to the subcontractor “ advances ” in amounts equal to the payments. The lender, a factor, prevailed after a nonjury trial at Special Term. The Appellate Division reversed and granted judgment to plaintiff general contractor.
Plaintiff general contractor sued as subrogee of unpaid subcontractors and suppliers whom it had paid pursuant to its obligation under a payment bond. It also sued to recover the excess cost of completion of the project. Defendant factor appeals, and plaintiff general contractor cross-appeals from the denial to it of the excess cost of completion and of attorney’s fees, arguing as to attorney’s fees that this is a representative action in which it is entitled to such recovery.
The order of the Appellate Division should be affirmed in all respects. The factor was guilty of a diversion when it received the entrusted payments from the subcontractor and again when it gave its checks or advances for the entrusted payments. It thus received payments intended for the trust beneficiaries and in effect applied them to its outstanding earlier loans to the subcontractor, as part of a revolving credit. It also put into the hands of the subcontractor its checks apparently free of indicia of the lien or trust resulting from the project payments. The general contractor is not entitled to recover attorney’s fees because it is indeed .suing only on its own behalf and because attorney’s fees in a representative action of this kind are generally allowed only out of the fund or property recovered. Nor *511 is it entitled to recover the excess cost of completion from the factor.
Plaintiff Caristo was the general contractor for the construction of the Victory Memorial Hospital. Raymar Contracting Corporation was the subcontractor for the heating, air-conditioning, and ventilation work. Before its default and insolvency Raymar was paid $179,819.60 by the general contractor, of which $169,469.60 was turned over to the factor under an assignment of all its accounts receivable to secure a revolving credit. It failed to pay its subcontractors and suppliers $53,899.12, which obligations the general contractor subsequently discharged under its payment bond. In addition, the general contractor expended $1,029.10 as the cost of completion of the project in excess of the payments required by the Raymar subcontract.
Raymar had arranged for financing with defendant factor (actually with its predecessor Simpson Factors) by way of a revolving credit of up to $215,000, and later, up to $290,000. To secure the credit Raymar assigned all accounts receivable under existing contracts, both past and future, of which the hospital accounts were only a part. The factor knew that the assigned accounts were the result of construction projects and, therefore, were trust funds under article 3-A of the Lien Law. Nevertheless, it did not file the assignment or a notice of lending as required by section 73 of the Lien Law. As payments were received by Raymar from various projects, including the hospital project, they were handed directly to the factor. The factor in turn gave its own checks payable to Raymar in equal amounts and at approximately the .same times as it received the Caristo checks payable to Raymar. The effect in the account records kept by the factor was to reflect an offset of incoming and outgoing payments, the outstanding balances on the revolving credit remaining the same except for accretions of interest.
The general contractor asserts that the transactions between the factor and Raymar constituted a forbidden diversion of trust assets under article 3-A of the Lien Law, and that the factor is liable for such diversion to the extent of the unpaid beneficiaries’ claims. To bolster its position, the general contractor points out that the checks payable to Raymar, after being indorsed in Raymar’s name, were deposited under a *512 masking code number in the-factor’s bank account and not in a depository in the trustee’s name (and presumably control) as required by section 75 of the Lien Law.
The factor argues that these transactions did not amount to a diversion of trust funds because it did not retain the payments but simply acted as a conduit for the checks Raymar had received, just as if it were a collecting bank. It contends that the procedure followed was intended only to secure its lien on assigned accounts under the rule of Benedict v. Ratner (268 U. S. 353) that an assignment of accounts is void as against creditors if the assignor by agreement or in fact retains full dominion over the proceeds of the accounts.
The root of the matter is that the Lien Law (art. 3-A and its predecessor article) was designed to create trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction (§§ 70, 71). To make the .statutory trusts effective various procedures are mandated in the handling of such trust funds much akin to the requirements affecting voluntary trusts (art. 3-A, passim; see, generally, Aquilino v. United States of America, 10 N Y 2d 271). The statutory trustee is required to maintain separate books (or, at his option, separate bank accounts) for each trust fund. In addition, his books of account must indicate the beneficiaries of each trust and all persons to whom trust funds are paid (§ 75). Persons dealing with those handling trust funds, who may be charged -with notice of the trust, may share in liability for unlawful diversions (§§ 72, 73, 79-a).
The factor in this case did two things exposing it to liability. First, it received payments covered by a trust, namely, the checks drawn by Caristo payable to Raymar. When these payments were applied to the loan account they were not being used for a permissible trust purpose. It is no answer, as the factor contends, that it was merely exchanging checks. The fact is that the checks were subject to the assignments of the accounts receivable and, therefore, the factor, as between it and its assignor, was entitled to receive those checks to its own use. (Since its assignment or notice thereof had not been filed, the assignment was void as to trust beneficiaries [American Blower Corp. v. James Talcott, Inc., 10 N Y 2d *513 282].) If, at any time, the factor had elected not to give its “ exchange ” check for the Caristo check it would nevertheless have been entitled under the assignment to retain the Caristo payment. Thus, the alleged exchanges were truly, as argued by Caristo, new advances after the repayment of old ones under the revolving credit. The factor’s argument that it did this solely to comply with the rule in Benedict v. Ratner (268 U. S. 353, supra) merely emphasizes the fact that it was exercising some dominion over those payments.
Second, the factor provided Raymar with its own checks payable to Raymar free of any indication that the proceeds might have arisen from entrusted funds. This was particularly significant since the course of dealing involved a mingling of funds received by Raymar on different projects. True, the underlying original or initial voucher records in the hands of the factor show that the sources of various funds were allocated to appropriate projects. But this allocation does not appear in the secondary account records and, of course, is in no way evident on the checks given by the factor to Raymar, payable to Raymar’s order.
On this view, the several acts of the factor, especially when taken in conjunction, would suffice either to effect or to facilitate a diversion of trust funds. By either of the factor’s acts the salutary purposes of the rather rigorous regulations of the Lien Law were avoided or blunted. It is true that if the “ exchange ” checks had thereafter been used by Ramar to pay trust claims and there had been no loss to anyone, there would have been no ultimate diversion or loss for which the factor would be liable. But there was no such evidence as to the use to which the “ exchange ” checks were put, and it is evident that as to unpaid claims discharged by the general contractor the trust was not executed.
In accepting the assigned trust funds under the revolving credit, the factor, therefore, participated in a diversion of trust assets under section 72 of the Lien Law. If it had filed a “ notice of lending,” the factor could have asserted, as an affirmative defense, that the advances made to Raymar ‘ ‘ were actually applied for a purpose of the trust ” (Lien Law, § 73, subd. 1). However, the factor failed to file such a notice and *514 it did not attempt to prove, at trial, that the advances were in fact used for trust purposes. This failure to file a notice of lending deprived Raymar’s materialmen and subcontractors of an important protection. As the Law Revision Commission Report dealing with the 1959 amendments noted, “ persons who furnish materials and services in reliance on the trust assets receivable by the trustee at a later stage of the improvement are entitled to notice that those assets have been anticipated for current expense. Notice of the borrowing is needed as credit information ” (1959 Report of N. Y. Law Rev. Comm., p. 216; N. Y. Legis. Doc., 1959, No. 65 [F], p. 32).
The factor argues that Trinca & Assoc, v. Tilden Constr. Corp. (44 Misc 2d 1094, affd. sub nom. Continental Cas. Co. v. Ruth Factors, 24 A D 2d 703, mot. for lv. to app. den. 16 N Y 2d 485) is directly in point. It is, in part; but two circumstances serve to distinguish the case. First, the assignments to the factor there had been properly filed, and this was held to give adequate notice to lienors. Second, the factor made the payments directly to the trust beneficiaries, thus effectuating the trust purpose. Significantly, the factor in the Trinca case made all of its checks payable to the lienors and not to the borrower.
Involved are not merely formal elements, conceived in some legal metaphysic, but practical commercial realities. Notice of lending permits creditors of the subcontractor to learn that their debtor’s finances are tightly extended and, specifically, that its accounts receivable are assigned. Under such circumstances further credit would be granted charily and greater promptness of payment required. Since the Caristo-to-Raymar checks bore only Raymar’s “ endorsement ” and the masking code number, the general contractor was prevented from learning that its subcontractor’s accounts receivable had been factored and, therefore, its finances were tightly extended. The general contractor, because of these devices, could not learn that it faced a greater risk of liability on its payment bond. Had it so learned, it could have taken measures to see that the subcontractor’s trust responsibilities were effectuated, even to following the disbursements out of the project checks the general contractor was giving to the subcontractor. Lastly, the receipt by the subcontractor of the lender’s “ exchange checks ” *515 psychologically encouraged and practically permitted the subcontractor to ignore or confuse more easily its trust responsibilities. With the earmark on the trust funds lifted, the subcontractor could consider that it was dealing with fungible moneys received from its financing factor under the revolving credit. These were among the evils which the legislation was intended to remedy.
Apart from the primary issue, defendant factor also argues that it was a purchaser for value of the Caristo-to-Raymar checks, that the trust was discharged when the trust claims were paid and the general contractor, therefore, is not a subrogee, and that article 3-A of the Lien Law does not apply because the new statute was applicable only to improvements' begun after its effective date and the architects’ plans for the hospital project had been drawn before that date. These arguments are not substantial and do not require discussion.
Lastly, the general contractor cross-appeals asking for attorney’s fees and the excess cost of completing the project. It points out that under the statute it is entitled to bring a representative action on behalf of all unpaid claimants, and that, therefore, this is a representative action (Lien Law, § 77, subd. 1). The general contractor having paid all the claims, there is no need for such an action; as subrogee it is the only claimant now. Moreover, the right to attorney’s fees in a representative action based upon the creation or preservation of a fund is generally only against the fund or property (see Matter of Ayman v. Teachers’ Retirement Bd., 30 Misc 2d 828, 830; Ann. Attorneys’ Fees-Fund Increased or Protected, 49 A. L. R. 1149, 1180-1184; cf. Woodruff v. New York, L. E. & W. R. R. Co., 129 N. Y. 27, 30-31). The general contractor has received the whole fund and is entitled now to retain it. Finally, the allowance of attorney’s fees is a matter of discretion resting with the lower courts and, therefore, hardly subject to review in this court (Ann. Costs and Fees-Trust Litigation, 9 ALR 2d 1140, 1156). As for the excess cost of construction, such cost resulted, as the factor argues, from the subcontractor’s breach of contract and not from any diversion of funds. The excess cost was never a claim against the trust fund. Hence, there is no basis for the cross appeal.
*516 Accordingly, the order of the Appellate Division should be affirmed in all respects, with costs to plaintiff-respondent-appellant.