OPINION OF THE COURT
 

 Levine, J.
 

 In 1978, the New York City Department of Ports and Terminals, on behalf of the City, and Northeast Marine Terminal Co. (Northeast) entered into a long-term lease agree
 
 *151
 
 ment pursuant to which Northeast occupied a City-owned marine terminal in Brooklyn, for the operation of its stevedoring business. The lease covered the terminal facility and the structures and fixtures located there, including two fixed Star-porter cranes used to unload cargo. Under the terms of the lease, Northeast agreed to obtain "for the benefit of [the City] Lessor, [casualty] insurance for the buildings, structures and improvements * * * on the Demised Premises and the equipment thereon” (Lease § 11.01). In accordance with that provision, Northeast obtained an insurance policy from Federal Insurance Co., an affiliate of Chubb & Sons, Inc. (Chubb), which included an equipment floater covering the two Starporter cranes. The City was designated as an additional insured with respect to these cranes.
 

 Subsequently, in the summer of 1980, the two Starporter cranes were damaged during a violent windstorm. The lease agreement gave the City the option to apply the insurance proceeds to repair the cranes, without any abatement of rent, and the City elected to do so. Chubb agreed that it would pay as the casualty loss all reasonable costs incurred for material and labor necessary to repair the cranes. To facilitate the repairs, the City and Northeast made a separate agreement pursuant to which (1) Northeast would act in the role of a general contractor to supervise the necessary repair work; (2) Canron Corporation (Canron) would be retained by Northeast to do the bulk of the actual repair work; (3) Northeast would prepare and submit to the insurer all documentation necessary for the payment of the casualty loss; and (4) the City would pay to Northeast all of its charges for the repair of the cranes, upon approval of the work, to the extent of the insurance proceeds actually received by the City from Chubb for this purpose.
 

 Pursuant to that agreement, Canron was retained by Northeast to do the work on the cranes and the repairs were accomplished during 1980 and 1981. As the repairs progressed to completion, Canron submitted a series of invoices totaling $797,549.05 to Northeast, who, after approving each one, remitted them to Chubb for payment along with its own invoices for its performance under the agreement. Chubb approved all of the invoices submitted by Northeast for payment under the policy and issued six checks representing the total amount of charges by Northeast and Canron under the repair contract. Chubb delivered these checks, made payable to both Northeast and the City, to Northeast who endorsed them and then turned them over to the City. Generally, accompanying the endorsed
 
 *152
 
 Chubb checks delivered to the City were Northeast’s own vouchers demanding payment from the City in the amount paid by Chubb. The insurance checks were then endorsed by the City and deposited into a City account. After independently approving the invoices for payment, as permitted under its agreement with Northeast, the City drew and delivered its own checks to Northeast, who then paid Canron the amount due it for its approved repair work.
 

 This procedure, whereby the insurance proceeds were routed from Chubb through Northeast to the City and then back (via a check drawn on a City account) to Northeast, was followed for the first five insurance proceeds checks issued by Chubb for the crane repairs. However, it was not followed with respect to the sixth and final insurance check, the disposition of which is the subject matter of this appeal.
 

 At the time the final check was issued by Chubb on June 25, 1981 (in the amount of $290,579.03), Northeast had accrued rent arrears under the marine terminal facility lease of over $1.8 million. During 1980 and 1981, while the repairs of the cranes were going on, the City and Northeast had entered a series of oral agreements regarding Northeast’s payment of the mounting rent arrears. Finally, on July 9,1981, the parties entered into a written stipulation which provided for the payment of current rent as it became due and the payment of past due rent amortized over two years. Upon execution of the stipulation, Northeast also delivered to the City three checks total-ling more than $525,000, to be applied to the sum due under the rent arrears stipulation. One of these checks was the final check issued by Chubb to the City and Northeast for the crane repairs. In a letter accompanying the signed stipulation and checks, Northeast assigned "all [of its] right title and interest in said Chubb draft” and agreed to indemnify the City "for any claim of non-payment arising or occurring by virtue of not applying any or all of the proceeds of the Chubb draft toward payment of the repair of the crane.”
 

 The City accepted the assignment of the insurance check and, instead of using the insurance proceeds to make payment to Northeast on its final and outstanding payment voucher for the crane repair work, applied this final Chubb payment against the balance then due from Northeast under the lease and rent stipulation. The City thus accounted for the sixth Chubb check both as a payment on Northeast’s debt to it under the lease and rent arrears stipulation, and as payment of
 
 its
 
 debt to Northeast under the crane repair agreement.
 

 
 *153
 
 Because of the foregoing rent arrears payment arrangement, Northeast was unable to pay over to Canron the balance due for Canron’s work on the crane repairs ($265,271.90), as it had done with respect to prior progress payments from insurance proceeds. Northeast filed for bankruptcy in November 1981, leaving that balance unpaid. Canron sought payment from the City of the final amount due it. When the City rejected its demand for payment Canron instituted this action seeking to impose a statutory trust under article 3-A of the Lien Law upon the funds that Chubb had paid for the repairs to the damaged cranes and which remained in the City’s control.
 

 Following extensive motion practice, the parties submitted the case to Supreme Court for disposition on stipulated facts and documentary evidence. Supreme Court found in Canron’s favor, holding that by assigning its interest in the sixth Chubb check to the City with the request that the funds be applied to its lease rent arrears, Northeast had waived its right of action against the City upon the balance due it under the crane repair agreement, and that this waiver constituted a diversion of a trust asset (the trust asset being the right of action for funds due or earned by a contractor under a public improvement contract) within the meaning of Lien Law § 72. Supreme Court ordered the City to account to Canron as to the full amount of the insurance proceeds (see, Lien Law § 77 [3] [a] [i]) and directed that Canron recover against the proceeds to the extent of its claim of nonpayment, plus interest (see,
 
 id.).
 

 The City defendants appealed and the Appellate Division, one Justice dissenting, affirmed (214 AD2d 115), primarily on the theory that the agreement between Northeast and the City as to the use of the sixth Chubb check constituted an improper diversion of funds received under the crane repair contract (rather than the diversion of a right of action to those funds)
 
 {id.,
 
 at 119-122). That Court having granted defendants leave to appeal, we now affirm.
 

 Article 3-A of the Lien Law (Lien Law §§ 70 — 79-a) "create[s] trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction”
 
 (Caristo Constr. Corp. v Diners Fin. Corp.,
 
 21 NY2d 507, 512). These statutory provisions "were intended to insure that funds obtained for financing of an improvement of real property and moneys earned in the performance of a contract for either a privately owned improvement or a public improvement will in fact be used to pay the costs of that
 
 *154
 
 improvement” (1959 Report of NY Law Rev Commn, at 209, reprinted in 1959 NY Legis Doc No. 65 [F], at 25;
 
 see also, West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co.,
 
 87 NY2d 148, 157-158). As pertinent to this case, the statute defines as a trust asset "funds * * * received by a contractor under or in connection with * * * a contract for a public improvement in this state * * * and any right of action for any such funds” (Lien Law § 70 [1]).
 

 The contractor must hold and apply those trust assets for certain expenditures arising out of the improvement and incurred in the performance of its contract, including the "payment of claims of subcontractors” (Lien Law § 71 [2] [a]). The subcontractor’s claim for payment for work performed on the improvement is thus deemed a "trust claim” (Lien Law § 71 [3] [b]) and the subcontractor is designated a "beneficiary” of the contractor’s "trust” (Lien Law § 71 [4]).
 

 An improper diversion of the contractor’s trust assets occurs when any such trust asset is paid, transferred or applied for a nontrust purpose, that is, for any purpose other than the expenditures authorized in section 71 (2), before all of the trust claims have been paid or discharged (Lien Law § 72 [1]). A trust beneficiary may enforce its rights against any nonbeneficiary who receives trust assets with knowledge of their trust status (Lien Law § 77 [3] [a] [i], [vi];
 
 Caristo Constr. Corp. v Diners Fin. Corp.,
 
 21 NY2d, at 512,
 
 supra).
 

 The City does not dispute that if the insurance proceeds represented by the final Chubb check had been disposed of according to the parties’ prior practice, by routing the proceeds through a City account to Northeast (in the form of a City check issued as payment under the repair contract), a trust asset would have been created and payment to the City of an unrelated debt with those funds would have constituted an unlawful diversion under the statute
 
 (Caristo Constr. Corp. v Diners Fin. Corp., supra,
 
 at 510). Accordingly, the issue devolves to whether, by the procedure of Northeast and the City with respect to the application of the proceeds of the final Chubb check under an assignment from Northeast to the City without actual delivery of the funds, those parties prevented a trust asset from coming into existence. We agree with both courts below that a trust asset was nonetheless created in this final transaction, under either of two validly applicable rationales.
 

 First, in the final transaction as structured by Northeast and the City, Northeast obtained the benefit of the proceeds of
 
 *155
 
 the Chubb draft because they were applied to an unrelated debt, and Northeast obtained this benefit in connection with the crane repair agreement since the City also accounted for the insurance proceeds as payment on its debt to Northeast under that agreement. Thus, functionally, the proceeds were "funds * * * received by a contractor * * * in connection with * * * [this] contract for a public improvement” (Lien Law § 70 [1]), and in that way a trust asset was created. We have consistently recognized that the primary purpose of the Lien Law is to ensure that "those who have directly expended labor and materials to improve real property [or a public improvement] at the direction of the owner or a general contractor” receive payment for the work actually performed
 
 (West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co.,
 
 87 NY2d 148, 157, supra;
 
 see, Aquilino v United States,
 
 10 NY2d 271, 278-279). In light of that protective purpose there is no reason not to apply the doctrine, primarily utilized to prevent tax avoidance, whereby a party who has the right to receive compensation is held to have constructively received or come into possession of it upon directing application of the funds to satisfy a personal debt or to achieve some other personally desired result
 
 (see, Lucas v Earl,
 
 281 US 111 [salary that would have been actually received by taxpayer if not for partial assignment held to have been constructively received by taxpayer for purposes of Federal income tax liability];
 
 Old Colony Trust Co. v Commissioner of Internal Revenue,
 
 279 US 716, 729 [employer’s payment of employee’s income tax obligation constitutes additional income constructively received by employee];
 
 United States v Mews,
 
 923 F2d 67, 68 ["a shareholder cannot, by directing his corporation to pay to X rather than to himself what corporation law deems a dividend to him, avoid having to report it as income”]). Moreover, the legislative history of the Lien Law trust provisions indicates that such constructive possession was always understood to be sufficient to confer trust status on contract funds so held
 
 (see,
 
 1942 Report of NY Law Rev Commn, at 326-327, reprinted in 1942 NY Legis Doc No. 65 [H], at 56-57 [noting that under the trust provisions as they existed prior to the 1942 amendment which first designated a right of action for payment as an asset of the statutory trusts, "it is necessary that the trustee * * * have (at least)
 
 constructive possession
 
 of the fund * * * for a trust to arise”] [emphasis supplied]).
 

 Alternatively, it cannot be doubted that Northeast, at the time of disposition of the final insurance check, possessed a
 
 *156
 
 trust asset in the form of a "right of action for any such funds” (Lien Law § 70 [1]). That trust asset was illegally diverted for a nontrust purpose when Northeast agreed to apply the proceeds to its rent arrears, in full satisfaction of the balance legally due it under the public improvement contract. The Lien Law was expanded in 1942 to add as a trust asset a right of action for funds received in connection with a public or private real property improvement contract (L 1942, ch 808). The purpose of this amendment was to fill a gap in the existing law which did not at that time recognize such a right of action as an asset of the statutory trusts (see, 1942 Report of NY Law Rev Commn, at 284, reprinted in 1942 NY Legis Doc No. 65 [H], at 14 ["Under present law, the right to receive moneys which, if received, would constitute trust funds, is not a trust res. This is a gap in the law. The Commission proposes that the trust res, for the purposes of a civil action only, should be expanded to enable a beneficiary to reach such choses in action.”]).
 

 We reject the City’s position, adopted by the dissenting Justice at the Appellate Division, that no trust asset of any value was diverted in light of the proviso in Lien Law § 70 (1), added in 1959 (L 1959, ch 696), that "the fact that the right [of action] is a trust asset does not enlarge the right.” The City insists that the quoted language means that the general contractor’s right of action to receive payment is limited by and subject to any offsets and counterclaims which the owner may have against the contractor’s claim for payment under the improvement contract, and thus, because Northeast’s right of action was always subject to complete offset by the City’s greater claim for rent arrears, the allegedly diverted trust asset had no value. We disagree.
 

 Defendants’ position rests entirely on the assumption that the Legislature, in adding the "no-enlargement” proviso to the trust asset status of the contractor’s right of action for payment, intended to subject that trust asset to any and all offsets or counterclaims that the particular owner might have against the particular contractor. However, neither the plain meaning of the right of action trust asset amendment, nor its legislative history, supports defendants’ interpretation. Moreover, to accept the City’s position would largely frustrate the salutary purposes of the Lien Law trust fund article.
 

 The specific provision upon which the City relies, states in full:
 

 "For the purposes of this section: (a) any
 
 right to
 
 
 *157
 

 receive payment at a future time
 
 shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event, but the fact that the right is a trust asset
 
 does not enlarge the right or excuse any performance or condition upon which it depends”
 
 (Lien Law § 70 [1] [a] [emphasis supplied]).
 

 By its express terms (the "right to receive payment at a future time”) and its legislative history, the 1959 amendment adding this proviso was primarily intended to extend the right of action as a trust asset to contingent, not fully matured rights to receive payment for work in progress. Thus, the Law Revision Commission’s sponsoring memorandum for the 1959 amendment states that it "clarifies the phrase ['right of action’] by stating that it includes any right to receive payment at a future time, even though contingent” (1959 Report of NY Law Rev Commn, at 218, reprinted in 1959 NY Legis Doc No. 65 [F], at 34).
 

 Taken in the light of this expansive purpose of the amendment containing the limiting language relied upon by the City, the meaning of the proviso is self-evident — to ensure that the enforcement rights of trust beneficiaries against the owner were not greater than the rights of the contractor
 
 under the contract
 
 and subject to the owner’s defenses to payment, if any,
 
 under the contract.
 

 [1]
 

 Thus, the proviso in question states that the expansion of the right of action concept as a trust asset to unmatured claims would not "excuse any performance or condition upon which it depends.” This more restricted purpose of the "no-enlargement” proviso is again confirmed by legislative history
 
 {see,
 
 Mem of Banking Dept, Bill Jacket, L 1959, ch 696 [by the addition of this language, "(a)n inchoate right to receive a payment at a future time is deemed an asset of the trust, even though the recipient
 
 must comply with some condition, as the performance of services,
 
 before becoming entitled to the money”] [emphasis supplied]).
 

 Moreover, defendants’ position is inconsistent with the long-settled principle that the contractor-trustee holds the trust assets in a fiduciary capacity akin to that of the trustee of an express trust
 
 (Aquilino v United States,
 
 10 NY2d, at 276, 279, supra) and thus, "does not have a sufficient beneficial interest
 
 *158
 
 in the moneys,
 
 due or to become due from the owner under the contract,
 
 to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid”
 
 (id.,
 
 at 282 [emphasis supplied]). Consistent with these fiduciary obligations, the contractor is statutorily prohibited from applying trust assets to his personal debts to the detriment of valid trust claims
 
 (see, id.,
 
 at 280). Similarly, the contractor’s trust obligations would be transgressed by an attempt to transfer, free of trust status, a right of action to payment under the improvement contract on the theory that the right of action has no value as a trust asset because of a greater personal debt owed by the contractor to the transferee — as was attempted by Northeast in this case.
 

 Additionally, the effect of the City’s position — to afford the personal and unrelated debts of the contractor precedence over what would otherwise constitute a valid trust claim— undermines the statute’s primary goal of "protecting] those whose skill, labor and materials made possible the performance of a construction contract and who in fact, creating the improvement, actually gave rise to the owner’s obligation to pay”
 
 (Aquilino v United States, supra,
 
 at 278-279;
 
 see, West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co.,
 
 87 NY2d, at 158,
 
 supra
 
 [recognizing that the foreclosure provisions of the Lien Law favor subcontractor’s liens over those of the general contractors]).
 

 In sum, subjecting trust claims to defenses that are personal to the general contractor-trustee and unrelated to the improvement contract contradicts both the language of the statute, and its remedial and protective purpose.
 
 [2]
 

 It follows from the foregoing that the City is answerable to Canron for the diversion to it of the trust asset which came into existence here. It is undisputed that sums were due Canron from Northeast upon completion of the crane repairs, that the amount due was outstanding when Northeast assigned the
 
 *159
 
 insurance proceeds to the City and agreed that they would be applied to its rent arrears in full satisfaction of the City’s debt to Northeast for completion of performance under the improvement contract, and that the City was aware of all of the foregoing facts. Thus, the City was not a bona fide transferee for value without notice of the transferred funds’ trust status and is plainly liable to Canron, a statutory trust beneficiary, for the diversion (see,
 
 Caristo Constr. Corp. v Diners Fin. Corp.,
 
 21 NY2d 507,
 
 supra
 
 [holding factor to whom contractor assigned money due it under construction contracts liable for knowing participation in diversion of trust assets]).
 

 We have considered defendants’ remaining contentions, and likewise find them to be without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Smith and Ciparick concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . This interpretation is consistent with the general rule that an "owner’s liability to [a] subcontractor is limited to the unpaid portion of the value or agreed to price of the improvements”
 
 (West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co.,
 
 87 NY2d, at 157,
 
 supra
 
 [citing Lien Law § 4 (1)]).
 

 [2]
 

 . We reject the City’s attempt to characterize the right of action which Canron seeks to enforce as arising out of the same transaction as Northeast’s rental obligation. The trust claim arises out of the repair agreement. The terminal lease did not require that Northeast or the City agree that Northeast would act as general contractor in accomplishing any necessary repairs that the City elected to make. And nothing in the description of the crane repair agreement, as set forth in the parties’ statement of stipulated facts, or in. any of the documentary evidence, indicates that the agreement between Northeast and the City regarding the repair of the cranes was subject to the terms of the lease.