851 A.2d 766 (2004)
370 N.J. Super. 563
RELIANCE INSURANCE COMPANY, Plaintiff-Respondent,
v.
The LOTT GROUP, INC., Lott Holdings, Inc., Lance C. Lott, Frank W. Lott, IV, Susan Lott, Denise Lott, Developmental Resource Group, Inc., Frazier Development, Inc., Defendants,
and
Steven Cucinotti, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 2003.
Decided July 6, 2004.
*767 Michael J. Troiani of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellant (Stein & Troiani, attorneys; Robert P. Stein, on the brief).
Scott D. Baron, Neptune, argued the cause for respondent (Wolff & Samson, attorneys; Mr. Baron, of counsel and on the brief).
Before Judges NEWMAN, PARRILLO and HOENS.
The opinion of the court was delivered by HOENS, J.A.D.
Defendant Steven Cucinotti appeals from an order granting summary judgment in favor of plaintiff Reliance Insurance Company. The order appealed from entered judgment in favor of Reliance and against Cucinotti individually in the amount of $331,943.68 together with interest and costs, based upon the trial judge's determination that Cucinotti was subject to and in violation of the New Jersey Construction Trust Fund Act. See N.J.S.A. 2A:44-148. Because this appeal raises issues of first impression, we address the contentions of the parties at some length.
*768 The facts on which the claims are based are not disputed. The Lott Group, Inc. was a general contractor which, at all times relevant, engaged in business as a general and electrical contractor on public projects. From 1991 through late 1992, plaintiff Reliance issued payment and performance bonds on Lott's behalf in favor of each of the public entities with whom Lott had entered into contracts. As is required for public projects, the bonds ensure both the completion, or performance, of the work and payment to laborers, materialmen and suppliers. See N.J.S.A. 2A:44-143.
In October 1990, Frank W. Lott IV, both personally and in his capacity as the chief executive officer of Lott Group, Inc. and Lott Holdings, Inc., together with Lance C. Lott, Susan Lott and Denise Lott, executed a continuing Indemnity Agreement in favor of Reliance in partial consideration for issuance of the bonds. Included in that agreement was the Sixth Paragraph, which impressed a trust upon all contract funds in favor of Reliance. That paragraph of the Indemnity Agreement provided, in relevant part, as follows:
SIXTH: That the entire contract price of any contract referred to in a Bond or Bonds, whether in the possession of the Undersigned or another, shall be and hereby is impressed with a trust in favor of Surety for the payment of obligations incurred for labor, materials and services in the performance of the contract work for which Surety would be liable under such Bond or Bonds and for the purpose of satisfying the conditions of the Bond executed in connection with the contract.
Following execution of the Indemnity Agreement, Reliance began to issue payment and performance bonds requested by Lott for its work on public projects. Contracts for work by the Lott corporations on three such projects are relevant to the issues before us. They are: (1) the 1991 contract between Lott and R.M. Shoemaker for electrical work on the construction of the Monmouth County Correctional Facility (Shoemaker contract); (2) the 1992 contract between Lott and Trenton State College relating to construction of a music building (Trenton State contract); and (3) a 1991 contract with the United States Coast Guard (Coast Guard Contract).
Late in 1992, the Lott corporations began to experience financial difficulties and began to fall behind in payments they were required to make for labor, material and other costs attributable to the three bonded projects. As a result, individuals and entities that had furnished labor, materials or supplies for the projects and to whom payment was outstanding began to make claims upon Reliance pursuant to the terms of the bonds. In addition, Frank Lott, recognizing that his company was in serious jeopardy of being declared in default [1] under the bonds, contacted Reliance in an effort to secure assistance in meeting his obligations. As a result, Reliance began paying claims and agreed to provide Lott with a cash infusion in order that his companies could meet their general payroll obligations.
*769 At about the same time as the claims were beginning to be filed with Reliance and while he was requesting financial assistance from Reliance, Frank Lott retained the services of Steven Cucinotti, a consultant. Lott and Cucinotti had known each other for many years, having first met at a time when Lott was starting his business and Cucinotti was part owner and operator of an electrical supply and distribution company. The two had remained friends since that time. At all times relevant, Cucinotti was the president and majority shareholder of a Delaware corporation, Developmental Resources Group, Inc. (DRG), and of its wholly owned subsidiary, Frazier Development Company. DRG, according to Cucinotti, was a management company which performed consulting work for troubled businesses and Frazier Development Company was a construction company.
When Cucinotti was retained, Lott was facing the termination by his bank of a $1.5 million line of credit because of his financial difficulties. As a result, Frank Lott contacted Cucinotti to elicit Cucinotti's help in resolving Lott's financial problems in general or in replacing the line of credit. Cucinotti advised Lott to immediately draw down the $800,000 then remaining on the line and to deposit it into a new account at a different bank in order to create a secure fund to use as working capital. In January 1993, Lott contacted Cucinotti to advise him that the line had been closed, apparently before he had been able to transfer the funds, and to tell Cucinotti that he was unable to collect approximately two to three million dollars in payments owed to him for work performed on a variety of projects,[2] which was significantly compromising the cash flow of the business.
Lott then entered into a general consulting agreement with DRG, the business entity of which Cucinotti was the majority, if not the sole, owner and president. Pursuant to their agreement, Cucinotti would assist Lott in devising a way to address his financial crisis so that Lott would be able to complete all of his unfinished construction projects, if possible, while at the same time minimizing Lott's personal exposure to Reliance and to other bonding companies under the continuing indemnity agreements.
Cucinotti was aware that all of the construction projects in which Lott and his company were involved were publicly-funded projects and that all of the payments Lott received were public monies, including all of the funds generated by the contracts for which Reliance had posted bonds. In fact, as a part of the consulting agreement with Lott, Cucinotti reviewed the status of all of the on-going projects, analyzed the financial records of the Lott Group and became familiar with the payment history on all of Lott's projects, including the Shoemaker and Trenton State contracts.
Cucinotti was also aware that, in spite of his advice to the contrary, Lott had contacted Reliance to elicit its assistance. As a part of his consulting services, Cucinotti attended and participated in several meetings during which Lott and representatives of Reliance discussed the bonded projects, the status of payments to Lott, the outstanding obligations Lott owed in connection with those projects and the indemnity *770 agreements that Lott and his family members had executed in their personal capacities. Cucinotti was aware that Reliance had begun an audit of the books and records of the Lott entities and projects and he was concerned that Lott would be forced out of business.
In approximately the middle of March 1993, Lott and Cucinotti devised a strategy to assist Lott in dealing with the continuing financial crisis. As a part of this strategy, Lott deposited approximately $600,000 in sums received as progress payments on the Shoemaker, Trenton State and Coast Guard projects into a new bank account. This was accomplished by first depositing a $603,354.72 progress payment on the Coast Guard contract into Lott's business payroll account at Farmers & Mechanics State Bank on March 31, 1993. Shortly thereafter, a progress payment on the Shoemaker contract of $305,426 and a progress payment on the Trenton State contract of $26,517.68 were utilized to open a new account at Mount Holly State Bank. Two weeks later, $300,000 of the sum that had first been deposited into the payroll account from the Coast Guard progress payment was added to the new account at the Mount Holly State Bank. Finally, on April 26, 1993, Lott Group made a wire transfer of $600,000 from the new Mount Holly State Bank account into a separate account at that bank held in the name of DRG. Cucinotti thereafter used the funds in the DRG account at Lott's direction to make payments on Lott's behalf for purposes other than the bonded obligations.
Lott certified that the strategy to divert payments from the bonded projects to other purposes was entirely Cucinotti's idea. Cucinotti asserted that the plan was in fact devised not by him but by Lott and that he at all times only acted pursuant to the instructions of Lott respecting the use of the money in the new account. Among the disbursements, however, according to Cucinotti, was a transfer of $300,000 into an account held by Frazier, which was Cucinotti's construction company. Those funds were regarded by the two as a loan from Lott after Lott considered, but rejected, the chance to become an equity owner of Frazier.
In May 1993, Reliance formally declared Lott in default on the bonded projects and stepped in to complete the work on the Shoemaker and Trenton State contracts, as well as on other projects not directly relevant to the issues on appeal. Based upon Frank Lott's agreement to assist Reliance in its completion of the bonded projects, and in light of Lott's assertion that he and the other individual indemnitors lacked the corporate or personal resources to repay any of the losses that Reliance would incur on the projects, Reliance agreed to release Lott Group from its obligations under the construction contracts and to release Frank Lott and the other indemnitors personally from their obligations under the Indemnity Agreement.
Reliance eventually sustained well in excess of $14 million in losses attributable to all of Lott's bonded contracts. As of January 2002, Reliance had sustained losses of $1,290,839.88, $3,261,353.18, and $442,182 on the Coast Guard, Shoemaker and Trenton State contracts, respectively.
When Reliance stepped in and took over the outstanding Lott projects, Cucinotti ceased his work under the consulting agreement. The money that had been diverted from the Shoemaker, Trenton State and Coast Guard projects into the DRG account, however, to the extent that it had not previously been paid out, remained in the DRG account. Cucinotti continued thereafter to issue checks from the DRG account for payment of Lott's personal debts and obligations through April 1996, long after the time when the Lott corporate *771 entities had defaulted on the bonded contracts. He therefore continued to assist in the use of the money from the bonded projects after Reliance had taken over the completion of those projects and after Lott and the other indemnitors had been released from their personal obligations to Reliance. Neither Cucinotti nor Lott advised Reliance about the existence of the funds in the DRG account.
In January 1995, Reliance filed its complaint against the two Lott companies, all of the individual indemnitors and DRG. By that time, Reliance had learned about the agreement between Lott and DRG and about the diversion of funds from the bonded projects into the DRG account. Its complaint, therefore, sought to rescind its release of the Lott companies and the individual indemnitors and to recover compensatory and punitive damages from them based on theories of fraud, conversion, breach of fiduciary duty, breach of the Indemnity Agreement, breach of constructive trust and breach of their statutory trust obligations under N.J.S.A. 2A:44-148. As to DRG, the complaint sought a declaration that the funds diverted from the bonded obligations were subject to the contract-based constructive trust imposed on those funds by the Indemnity Agreement between Reliance and its indemnitors and that they were similarly protected by the statutory trust created by the Construction Trust Fund Act, N.J.S.A. 2A:44-148. In addition, the complaint sought restitution from DRG, imposition of a constructive trust and an equitable lien on any remaining funds held by DRG, compensatory and punitive damages, and an accounting by DRG of its disposition of any of those monies.[3]
In or about May 1997, Reliance settled its claims against the Lott companies and the Lotts personally. At the same time, Reliance was granted leave to file its amended complaint, adding claims directed to Cucinotti individually as well as claims directed to Frazier, the wholly owned subsidiary of DRG. The counts in the amended complaint setting forth Reliance's claims against Cucinotti, Frazier and DRG were numerous.
Reliance included in the complaint counts asserting that DRG, Frazier and Cucinotti personally were liable to the surety for conspiracy, theft, receiving stolen property, conversion, fraud, tortious interference, breach of statutory trust pursuant to the terms of the Construction Trust Fund Act, N.J.S.A. 2A:44-148, and breach of the trust impressed on the funds pursuant to the Indemnity Agreement. Following discovery[4] Reliance moved for summary judgment on all of the counts in the complaint. In rulings following oral argument spanning three rounds of briefing on separate aspects of the issues in dispute, the motion judge found that Cucinotti was personally liable to Reliance for the funds diverted from the Trenton State and Shoemaker contracts[5] both pursuant to the terms of the Construction Trust *772 Fund Act and under the participation theory.
Cucinotti argues on appeal that the judge erred in his analysis of the Construction Trust Fund Act both because the language and intent of the Act are not broad enough to encompass actions of individuals who are not signatories to a construction contract and because there were genuine issues of material fact concerning the extent of Cucinotti's knowledge of the source of the funds in dispute. He argues on appeal that the judge erred in his analysis of the participation theory by applying it to a contractual rather than to a tort claim. We have considered the arguments raised by defendant on appeal in light of the record and the applicable legal principles and we now affirm.
We turn first to our analysis of the Construction Trust Fund Act, which provides as follows:
All money paid by the state of New Jersey or by any agency, commission or department thereof, or by any county, municipality or school district in the state, to any person pursuant to the provisions of any contract for any public improvement made between any such person and the state or any agency, commission or department thereof, or any county, municipality or school district in the state, shall constitute a trust fund in the hands of such person as such contractor, until all claims for labor, materials and other charges incurred in connection with the performance of such contract shall have been fully paid.
[N.J.S.A. 2A:44-148.]
First enacted in 1932 and still in full force and effect virtually in its original form, the primary purpose of the Act is to protect "those who have claims for labor, material and other charges incurred in fulfilling the contract between the governmental body and its contractor." Montefusco Excavating & Contracting Co. v. Middlesex County, 82 N.J. 519, 525, 414 A.2d 961 (1980). In addressing the reach of the Act, our Supreme Court has held that the language of the statute, while not explicitly so stating, "sufficiently evidence[s] legislative intent that a duty should exist throughout the contractual chain, requiring the parties to apply payments only for purposes of the project, at least where the recipient knows the source of the funds." Hiller & Skoglund, Inc. v. Atlantic Creosoting Co., 40 N.J. 6, 21, 190 A.2d 380 (1963). The Court continued in its analysis of the contractual chain on which the duty is imposed, holding:
While it cannot be said that the trust fund act prescribes a full-blown trust relationship all the way down the ladder with consequent effect upon strangers to the construction project, the underlying thought is clear that all those directly involved should do the right and honorable thing.
[Id. at 22-23, 190 A.2d 380 (footnote omitted).]
Cucinotti argues on appeal that while Lott was plainly subject to the Act, he is beyond its reach. He contends that because he was neither an agent nor an employee of Lott, the Act is not sufficiently broad in scope to impose a trust on the money once it left Lott's account and was deposited into the DRG account. He argues that in effect he acted as Lott's bank, holding the money and disbursing it only as directed to by Lott. He points out that the Act has been held not to apply in that circumstance and that the Act therefore cannot impose any obligation upon him. See American Lumberman's Mut. Cas. Co. v. Bradley Constr. Co., 127 N.J. Eq. 500, 13 A.2d 783 (Ch.1940), aff'd, 129 N.J. Eq. 278, 19 A.2d 242 (E. & A.1941). We disagree with Cucinotti's analysis.
*773 First, in American Lumberman's the Court of Errors and Appeals, in rather broad language, affirmed the decision of the Vice Chancellor. There, an insolvent contractor had deposited progress payments into a general operating account in its bank. The bank had then taken funds from that account in repayment of the contractor's bank loan. The surety sought to recover the funds from the bank on the theory that those funds were held in trust because they were payments due on the bonded obligations. The Court of Errors and Appeals affirmed the decision of the Vice Chancellor rejecting the surety's claim because once the funds were intermingled in the account, they had lost their trust character. See American Lumberman's, supra, 129 N.J. Eq. at 279-280, 19 A.2d 242.
Most important, however is that the Vice Chancellor's underlying decision turned on the fact that the bank indisputably was unaware of the source of the funds on deposit. See American Lumberman's, supra, 127 N.J. Eq. at 508, 13 A.2d 783. The Vice Chancellor, in reaching his decision, had pointed out the impracticality of requiring a bank to monitor the source of every deposit into a general operating account and to thereafter trace each penny of each payment. He reasoned, therefore, that the trust impressed on the funds in the hands of the contractor did not extend to those funds after deposit. Ibid.
Notwithstanding that analysis, however, the Vice Chancellor continued, basing his decision on the fact that there was no evidence that the bank knew that the funds were included within the scope of the Act's protection. He held: "So long as the bank had no notice to the contrary it would have the right to assume that the contractor was committing no breach of trust in drawing checks against his general bank account." Ibid. The plain implication, however, is that, had the bank been aware that the only sources of the funds were public projects, a different result might have obtained. Significantly, in this regard, the Vice Chancelor noted: "In my judgment, the circumstances of this case do not spell out notice to the bank that the balance in defendant's bank account was a trust fund." Ibid. Nothing in the affirmance by the Court of Errors and Appeals affected this reasoning. The implication, therefore, is inescapable that, in general, the trust imposed by the statute on the funds continues to follow those funds throughout the contractual chain and beyond it to any recipient of those funds, at least with respect to those who have knowledge that the source of those funds is a public project.[6]
Second, Cucinotti was not acting as the equivalent of a bank. Unlike a banking institution, as to which any particular contractor's deposits and payments might best be described as either fungible or anonymous, Cucinotti knew that all of the construction work Lott did was pursuant to public contracts. He knew that the source of the money that was being deposited into the DRG account was publicly-funded contracts. He also knew that the projects were backed by surety bonds and that Lott was personally liable to the surety under the continuing Indemnity Agreement. He had read the Indemnity Agreement and he was aware of the contractual trust it imposed on the funds as well. Whether the initial idea for the diversion of the funds came from Cucinotti or from Lott, Cucinotti does not contest the fact that he originally advised Lott not to tell *774 Reliance about his increasingly precarious financial condition. Nor does he contend that he was unaware that when Reliance stepped into Lott's shoes, the funds remaining in the DRG account were being hidden from Reliance and used for Lott's personal expenses instead.
Third, while Cucinotti argues in the alternative that he was merely acting as an accountant for Lott and that he was not specifically aware that the funds in question came from the particular contracts as to which Reliance was the surety, we see nothing in the Act and we discern nothing in the legislative intent to require such particularized knowledge. For purposes of the trust imposed on money paid pursuant to public construction projects, it is sufficient that the recipient of the funds know, as did Cucinotti, that the source is a public project. See Hiller & Skoglund, Inc., supra, 40 N.J. at 21, 190 A.2d 380.
Next, Cucinotti argues, again in the alternative, that the application to him of the provisions of the Act cannot be sustained because only part of the funds that were deposited into the DRG account were from projects funded by governmental entities in New Jersey. He points out that part of the source of the funds was the Coast Guard contract, a federally funded project to which our Act would not apply. Because at least some of the funds transferred by Lott were outside the scope of the Act, Cucinotti contends that the requisite knowledge of the source of the funds is too attenuated to support judgment against him. We disagree.
First, the record is clear that the entirety of the progress payments from the Trenton State and Shoemaker contracts that had been first deposited into the Mount Holly account were transferred into the DRG account, with an additional sum of approximately $300,000 being added thereafter to that account from the Farmers and Merchants account into which the Coast Guard funds had been initially deposited. That being true, there is no doubt about the manner in which the funds can now be designated as being attributable to the state, as opposed to the federal, projects.
Second, regardless of whether the particular funds were generated by state or federal contracts, they were paid to Lott from public sources and Cucinotti was aware that all of the work performed by Lott was based on public contracts. Finally, the suggestion that the federally-generated funds could be diverted with impunity from the public purpose overlooks the impact of the Miller Act, 40 U.S.C.A. §§ 3131-3134 (formerly codified at 40 U.S.C.A. §§ 270a-270e), the federal analogue to our statutes requiring that contractors on public projects post payment and performance bonds, and which has been interpreted to impose a similar obligation. See United States ex rel. C.H. Benton, Inc. v. Roelof Constr. Co., 418 F.2d 1328, 1330 (9th Cir.1969); Graybar Elec. Co. v. John A. Volpe Constr. Co., 387 F.2d 55, 59 (5th Cir.1967); United States ex rel. Hyland Elec. Supply Co. v. Franchi Bros. Constr. Corp., 378 F.2d 134, 137-38 (2d Cir.1967). We reject Cucinotti's contention that his knowledge of the source of the funds was obscured or that the trust character of the funds was in some fashion diminished by the inclusion of a portion of the Coast Guard progress payment in the account.
We therefore hold that the reach of the Construction Trust Fund Act extends beyond those who are, strictly speaking, in the direct contractual chain to those who come into possession of funds generated from public projects with knowledge of the source as did Cucinotti. We reach this conclusion based on our determination that the Act was fundamentally intended to ensure *775 that public money is devoted to public purposes by impressing a trust upon that money until it achieves that purpose. See Key Agency v. Continental Cas. Co., 31 N.J. 98, 109, 155 A.2d 547 (1959) (construing "other charges" narrowly to restrict class of Act's beneficiaries); Stulz-Sickles Co. v. Fredburn Constr. Corp., 114 N.J. Eq. 475, 478-79, 169 A. 27 (Ch.1933)(describing intention of Act in part to prevent devotion of public funds to pay pre-existing debts owed to materialmen). The protection afforded by the Act would be hollow indeed if the trust it imposes could be so easily avoided by diversion of the funds to a third party whose only role is to make payments inconsistent with the public purpose.
Our research has revealed few decisions in which the issue we have addressed has been confronted. In fact, the statutes in other jurisdictions are so varied in their scope and design that no general proposition of law can be discerned from them. However, there are statutes generally similar to our Construction Trust Fund Act in New York and in Wisconsin which have given rise to decisions we find noteworthy. For example, New York's highest court has concluded that participation in a diversion of public funds suffices to create statutory liability. The New York Court of Appeals has held that a factor which took an assignment of receivables from a subcontractor and paid funds to the subcontractor to replace payments covered by that State's construction lien law engaged in a diversion of funds exposing the factor to liability. Caristo Constr. Corp. v. Diners Fin. Corp., 21 N.Y.2d 507, 289 N.Y.S.2d 175, 236 N.E.2d 461, 463 (1968); see Canron Corp. v. City of New York, 214 A.D.2d 115, 631 N.Y.S.2d 642, 646-47 (App.Div.1995), aff'd, 89 N.Y.2d 147, 652 N.Y.S.2d 211, 674 N.E.2d 1117 (1996).
In a related context, a trial level court in New York has held that officers of a corporation that received funds for real estate development purposes, to which the New York lien law applied, see McKinney's Lien Law §§ 70, 71(a), could be held personally responsible for participating in the diversion of those funds. See Schwadron v. Freund, 69 Misc.2d 342, 329 N.Y.S.2d 945, 953-54 (Sup.Ct.1972)(citing 4 Scott, Law of Trusts, 3rd Ed. § 326.3; Wechsler v. Bowman, 285 N.Y. 284, 34 N.E.2d 322 (1941); Santa Barbara v. Pasquale Avallone & Stefano Miele, Inc., 270 N.Y. 1, 199 N.E. 777, 779 (1936); Anderson v. Daley, 38 A.D. 505, 56 N.Y.S. 511 515 (1899)). Further, an appellate level decision from New York expressed the opinion that a bank that participated in diverting funds protected by its statute might also be liable to the intended beneficiaries. See Ben Soep Co. v. Highgate Hall of Orange County, Inc., 71 A.D.2d 825, 419 N.Y.S.2d 383, 386 (1979). Similarly, the Wisconsin Supreme Court, construing that state's statutory analogue to our Construction Trust Fund Act, which created a claim for theft against the contractor or subcontractor for diversion of funds, held that a bank which accepted funds in the form of municipal checks knowing that the checks originated from public improvement projects, took those funds subject to the statutory constructive trust. See Schneider Fuel & Supply Co. v. West Allis State Bank, 70 Wis.2d 1041, 236 N.W.2d 266, 271 (1975)(construing Wis. Stat. § 289.16 (1975)). It appears that the relevant statute has since been amended to limit the scope of the trust imposed to prime contractors and subcontractors, and to exclude banks from its reach, see Wis. Stat. § 289.16 (1979), but that court's broad reading of the earlier *776 language of that statute remains instructive.
While we can envision circumstances, as for example, where a true banking institution takes deposits without knowledge of the source, in which the imposition of a continuing trust obligation on the recipient would not be intended by the Act, the record before us provides ample ground on which to hold that the trust imposed by the Act on the funds continued after the funds were diverted through Cucinotti.
Certainly Cucinotti's knowledge was sufficient for the trust to be imposed on the funds. He operated as a consultant to businesses, like Lott's, in financial straits. He knew the role of the bonding company and the significance of publicly funded obligations. He knew that all of Lott's work was through public contracts. He advised Lott to conceal his financial crisis from Reliance. Whether he created the idea of the diversion of funds or merely acted to facilitate it, he knew that the funds coming from Lott were generated by public projects. We hold that no more particularized knowledge was required to support the imposition of the trust on those funds pursuant to the Act. In so holding, we reject Cucinotti's contention that he cannot be subject to the protection afforded by the Act because he was not specifically aware of the Act itself. Neither the Act nor the decisions interpreting its reach require specific knowledge of the terms of that statute. Rather, it is merely knowledge of the source of the funds that is required for the imposition of the statutory trust.
Cucinotti next contends that the trial court erred in holding him personally liable. He points out that Reliance rested its theory of personal liability on several grounds, each of which was essentially abandoned in favor of the participation theory as articulated by the Supreme Court in its decision in Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 788 A.2d 268 (2002), a decision released while the Reliance summary judgment motion was pending. While there are other reported decisions that hold that corporate officers who participate in fraud or conversion can be held personally liable for the losses occasioned thereby, see, e.g., Charles Bloom & Co. v. Echo Jewelers, 279 N.J.Super. 372, 382, 652 A.2d 1238 (App.Div.1995)(holding defendants personally liable for alleged conversion even when acting in corporate capacity); Robsac Indus., Inc. v. Chartpak, 204 N.J.Super. 149, 156, 497 A.2d 1267 (App.Div.1985)(reversing summary judgment for defendant corporate officer charged with malicious interference with contract, fraudulent misrepresentation, and defamation); Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J.Super. 452, 457, 489 A.2d 1209 (App.Div.1985)(declining to dismiss fraud complaint against corporate officer in absence of allegation of personal benefit); McGlynn v. Schultz, 95 N.J.Super. 412, 417, 231 A.2d 386 (App.Div.)(finding corporate officers personally liable for knowingly acquiescing in and ratifying alleged conversion), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967), because the motion judge based his determination on the participation theory and because of the apparent election by Reliance to forgo consideration of alternate theories of personal liability, we need not reach these alternate grounds. Rather, we consider only the motion judge's application of the Saltiel decision. The only issue before us respecting Cucinotti's personal liability, therefore, is whether the trial judge correctly analyzed and applied the participation theory to these facts. Plainly, he did.
The strict holding of the Supreme Court in Saltiel is found in its adoption of a rule by which a corporate officer can be *777 held personally liable for wrongful acts. In particular, the Court held:
Thus, the essence of the participation theory is that a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort. A predicate to liability is a finding that the corporation owed a duty of care to the victim, the duty was delegated to the officer and the officer breached the duty of care by his own conduct.
[Id. at 303, 788 A.2d 268.]
The individual's act of participating is significant, the motivation is not. The participation theory holds a corporate officer or director personally liable for his participation in the corporation's wrongdoing, even if he derived no personal benefit. Rather, as our Supreme Court held, he remains personally liable if he "acted on behalf, and in the name of, the corporation." Ibid. (quoting 3A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 1137 (rev.perm. ed.1994)). As the Court noted in Saltiel, the rationale for this rule was articulated by our Supreme Court more than fifty years ago:
It is well settled by the great weight of authority in this country that the officers of a corporation are personally liable to one whose money or property has been misappropriated or converted by them to the uses of the corporation, although they derived no personal benefit therefrom and acted merely as agents of the corporation. The underlying reason for this rule is that an officer should not be permitted to escape the consequences of his individual wrongdoing by saying that he acted on behalf of a corporation in which he was interested.
[Saltiel, supra, 170 N.J. at 304, 788 A.2d 268 (quoting Hirsch v. Phily, 4 N.J. 408, 416, 73 A.2d 173 (1950)).]
Cucinotti argues that he cannot fall within the scope of the participation theory. He argues that in Saltiel the Court specifically rejected the application of the theory to matters of contract, as a result of which it therefore cannot apply to him. We disagree.
The essence of the claim made here against Cucinotti arises from the Construction Trust Fund Act rather than from the contractual relationship between Lott and Reliance as represented by the Indemnity Agreement, which included similar trust language, or from any contract between Cucinotti and Lott. In the Saltiel decision itself, the Court made plain that claims of statutory violations fall within the scope of the participation theory. Saltiel, supra, 170 N.J. at 305, 788 A.2d 268 (citing Kugler v. Koscot Interplanetary, Inc., 120 N.J.Super. 216, 257, 293 A.2d 682 (Ch.1972)(Consumer Fraud Act); Plowman v. Bagnal, 316 S.C. 283, 450 S.E.2d 36, 37-38 (1994)(acknowledging that "controlling persons" in corporation are potentially personally liable for violation of South Carolina's Unfair Trade Practices Act)).
In short, Cucinotti's assertion that his active assistance in diverting funds protected by the Construction Trust Fund Act fell short of the behaviors our Supreme Court intended to reach by way of the participation theory is unpersuasive. The acts of an individual corporate officer, whether for personal gain or not, which operate to subvert the protective purposes of the Act cannot be shielded by the artifice of his use of a corporation to achieve the diversion.
Affirmed.
NOTES
[1] While we have recently held that a surety bond on a public project may not require a declaration of default by the owner as a precondition upon the public entity's assertion of its statutory rights, see Gloucester City Bd. of Educ. v. Am. Arbitration Ass'n, 333 N.J.Super. 511, 525-26, 755 A.2d 1256 (App.Div.2000), a declaration of default would trigger the surety's rights under the Indemnity Agreement executed by Lott and his family members individually. One of the traditional remedies then available to the surety, namely, the right to take over and complete the projects, would have, from Lott's standpoint, effectively removed him from control of the operation and finances of the businesses.
[2] While the specifics are not part of the record on appeal, Lott was involved in construction projects other than the three in issue in this dispute, and had received payment and performance bonds from sureties other than Reliance with respect to the other projects. Those bonds, like the ones issued by Reliance, presumably were backed by indemnity agreements as well.
[3] The January 1995 Complaint also asserted a variety of claims based on standard suretyship principles against the Lott entities and the Lotts individually. Those aspects of the complaint are not relevant to the issues on appeal.
[4] While the relevant documents are not included in the record on appeal, default and default judgment were entered against DRG in 1996 and against Frazier in 1999, leaving Cucinotti as the only defendant.
[5] No claim was made relating to recovery of the losses sustained under the Coast Guard contract due to the diversion of a portion of that progress payment. As a federal project, the Coast Guard contract falls outside of the scope of the Construction Trust Fund Act, N.J.S.A. 2A:44-148.
[6] Obviously, a recipient of funds for whom the Construction Trust Fund Act is designed to afford protection, namely, a materialman, laborer or supplier, takes funds paid on account of those efforts free of trust.