OPINION OF THE COURT
Carolyn E. Demarest, J.
Plaintiff Mike Building & Contracting, Inc. (plaintiff or Mike Building) moves, pursuant to CPLR 3212, for an order granting it partial summary judgment on its first cause of action against Just Homes, LLC (JH) for breach of contract, dismissal of JH’s first counterclaim for breach of contract, and for an award of attorney’s fees and costs. Defendants JH, Albert C. Tew, II, Garry Gutterman, William Berry, Sergio Condi, and James Berry (collectively defendants) move, pursuant to CPLR 3212, for an order granting them partial summary judgment dismissing the fifth cause of action of the complaint pleaded under article 3-A of the Lien Law for trust fund diversion and the sixth through tenth causes of action to pierce the corporate veil against the individual defendants who are the members of JH.
Facts and Procedural History
This is an action for breach of a construction contract entered into by plaintiff, a general construction contractor, and defendant LLC, which is a building developer owned by the individual defendant members. JH was formed as a limited liability company in February 2002 for the purpose of developing afford *836 able housing in New York City. In September 2000,[1] JH applied to the New York City Department of Housing Preservation and Development (HPD) to be designated a developer under the HomeWorks Homeownership Program (the HomeWorks program) — a program through which HPD conveys vacant city-owned buildings to developers at nominal cost for rehabilitation into multifamily dwellings. These construction projects are funded by loans from the Community Preservation Corporation (CPC), a private not-for-profit lending institution.
In March 2004, HPD awarded JH three real properties in Brooklyn, New York — 824 Friel Place, 455 18th Street, and 298 20th Street (the properties) — from the HomeWorks program. The instant action involves the property located at 298 20th Street (the subject property or premises).[2]-
According to the affidavit submitted by defendant Tew, as early as October 2004, JH began working with plaintiff and the architectural firm RCGA Architects (RCGA) concerning the rehabilitation of the properties. Architect Robert St. C. Gaskin, A.I.A., RCGA’s principal, became the architect of record on the properties.
On July 12, 2005, plaintiff entered into a contract with JH for the improvement of all three properties for the sum of $1,350,965 (the contract). Mr. Tew states that he executed the contract solely on behalf of JH, and not in any individual capacity, although plaintiff maintains that Mr. Tew executed the contract in his individual capacity because JH did not pass an appropriate resolution. However, Mr. Tew also executed the mortgage and loan agreement with CPC and the land disposition agreement with the City of New York, HPD, as JH’s member. This court rejects plaintiffs suggestion that a resolution of the entire membership of JH was necessary to authorize Tew’s acts since they were clearly performed within the context *837 of JH’s business purpose. The contract, which was drafted by CPC’s engineer, Ira D. Streitfeld, a licensed architect in the State of New York, lists only JH and plaintiff as contracting parties but many of the provisions of JH’s agreement with CPC are incorporated into plaintiff’s contract. The face of the contract bears the caveat: “In the event the Community Preservation Corp. (C.EC.) does not enter into a mortgage with the owner, this contract shall be null and void.”
On August 25, 2005, JH closed on the purchase of the properties from HPD, paying $1 for each. On that same date, JH closed on a building loan (the building loan) from CPC in the sum of $1,225,000. Under the building loan agreement with CPC, JH was obligated to provide $193,415 in borrower’s or owner’s equity (borrower’s equity) from its own funds towards the project’s construction contract price of $1,350,965.® Susan Foresta, assistant vice-president of CPC, testified at her deposition that CPC required borrowers to “have a minimum of 20 percent equity in [the] [p]roject” before it underwrote the building loan.[3]
[4] According to Ms. Foresta, “[w]ithout the owner’s equity, the [p]roject could not have been completed.” The building loan agreement provides “[a]s a condition precedent to any advances of the Loan, the Borrower shall first have paid the Borrower’s Equity Requirement set forth in Exhibit B.” (Schedule I, section 2.) Exhibit B provides that the $193,415 in borrower’s equity would be funded within the first 10 building loan advances at the rate of $19,341.50 per advance. Ms. Foresta explained that borrower’s equity is not in CPC’s possession, but that the borrower, JH, was expected to fund its portion of the equity, in increments of $19,341.50, together with the funds advanced by CPC, in making payment to the contractor (Foresta deposition at 24-25, 92-93). Thus, the contractual provision anticipates that CPC would deduct $19,341.50 from each authorized advance, to be made up to plaintiff by JH.
*838 The operative facts are not significantly disputed.[5]
[6]Work commenced on the project in October 2006, and, on or about October 23, 2006, plaintiff submitted its first payment requisition to JH, certified by RCGA Architects, in the amount of $124,914, exclusive of retainage of $13,879.® The building loan agreement (schedule I, para 5 [a]) required CPC’s engineer, Ira Streitfeld, to approve each payment requisition, following inspection of the site, to ensure that the actual quantity of work on the properties was consistent with that claimed by plaintiff, as certified by the architect. This requirement was also incorporated into the contract with plaintiff (contract, at 16, 11 8).[7] Only $111,497 out of the $124,914 requested was approved by CPC on the first requisition, purportedly because of deficiencies in the work found by CPC’s engineer. On or about November 27, 2006, CPC advanced to JH $82,939.95 for the first requisition and JH paid plaintiff $83,000. The discrepancy between the amount approved by CPC’s engineer and the amount advanced to JH from CPC under the building loan agreement was the result of CPC deducting $19,341.50 in owner’s equity, and then withholding 10% retainage of $9,215.50 ($111,497 - $19,341.50 - $9,215.50 [$92,155.50 x 10%] = $82,939.95).
On or about January 22, 2007, plaintiff submitted its second payment requisition, again approved by RCGA Architects, in the amount of $180,182.40, deducting retainage from the total claim. CPC’s engineer approved only $68,123 as the value of plaintiffs completed work at the project and, on or about January 29, 2007, CPC advanced to JH $43,903.35 for the second requisition. The next day, JH paid plaintiff $47,000. The discrepancy between the amount approved by CPC’s engineer and the amount advanced to JH from CPC was again the result of CPC deducting $19,341.50 in owner’s equity from the amount approved by CPC’s engineer and then withholding 10% retain- *839 age of $4,878.15 ($68,123 - $19,341.50 - $4,878.10 [$48,781.50 x 10%] = $43,903.35).
On or about March 12, 2007, plaintiff submitted its third payment requisition, as certified by the project’s architect, claiming payment due in the amount of $336,555.18.® CPC’s engineer only approved $26,194.50 of the third payment requisition as the value of plaintiffs work at the project. After deducting the borrower’s equity and 10% retainage, on or about March 26, 2007, CPC advanced to JH $8,787.15 for the third requisition which JH did not pay to plaintiff because, as Mr. Tew states in his affidavit, members of JH suspected that Mr. Gaskin of RCGA, and plaintiffs principal, Mike Fisher, were attempting to defraud JH and CPC. It is undisputed that the $8,787.15 advanced by CPC and withheld from plaintiff are trust funds under article 3-A of the Lien Law.
Thereafter, on March 28, 2007, defendant Gutterman attended a meeting on behalf of JH with plaintiffs Mike Fisher, the representatives from HPD and CPC, Mr. Streitfeld, Mr. Gaskin, and other members of JH to discuss the “huge discrepancies” between the amount requested in plaintiff’s three payment requisitions and the amount approved by Mr. Streitfeld on behalf of CPC, the quality of plaintiffs work, and the substantial project delays. Because Mr. Streitfeld had only approved approximately $26,000 of the approximately $335,000 requested by plaintiff and certified by Mr. Gaskin in the third payment requisition, JH believed there was a “serious problem” with plaintiff and Mr. Gaskin on the project.[8]
[9] Plaintiffs termination was discussed and Mr. Gutterman purportedly verbally terminated plaintiff. Neither Mr. Streitfeld nor CPC voiced objection at the time.
*840 By letter dated April 5, 2007, Mr. Gutterman advised Ms. Foresta that JH had contacted a number of contractors to replace plaintiff, and requested to meet with plaintiff to reach an amicable agreement concerning the termination. CPC did not object to this course of action. Thereafter, by letter dated April 16, 2007, JH formally terminated plaintiff’s services “[plursuant to Section 14.2 of the contract,” the owner’s termination provision.
Plaintiff alleges that JH misappropriated and diverted $58,024.50 ($19,341.50 times three) in trust funds comprised of JH’s borrower’s equity deducted from advances by CPC and not added by JH to the payments made to it. Plaintiff also asserts that defendants misappropriated $8,787.15 in trust funds (the final CPC advance) to pay for their attorney’s fees ($6,000) and other unaccounted-for expenses ($2,787.15). However, defendants have submitted evidence that on or about January 4, 2007, JH made a proper trust fund payment to Ace Boring, a boring contractor which had performed test borings on the project, in the amount of $2,615 and, on or about February 8, 2007, JH made two trust fund payments to RCGA (the architect) in the amount of $5,000 each. Thus, defendants contend that of the $135,630.45 actually disbursed to JH by CPC in loan proceeds, which they concede were article 3-A trust funds, $130,000 was paid to plaintiff and the balance was exhausted in the payments made to Ace and RCGA. In contrast, plaintiff insists JH diverted $66,811.65, inclusive of $58,024.50 in borrower’s equity and the $8,787.15, which it claims was not applied to eligible trust purposes but to the payment of attorney’s fees and other ineligible expenses.
When plaintiff was terminated on April 16, 2007, it had not substantially completed its work under the contract. According to plaintiff, JH evicted it from the project for the purpose of hiring a replacement contractor. This is not disputed by defendants though good cause is asserted in plaintiffs allegedly defective and fraudulent performance.
On May 3, 2007, plaintiff filed a mechanic’s lien with the Kings County Clerk against the subject property (298 20th Street) for the sum of $7,000. CPC thereafter terminated the loan in 2007 when JH was unable to remove the lien. (See Foresta deposition at 40-45, exhibit 23 to Misir affidavit in opposition.) The instant action was commenced on August 20, 2007 and, on March 31, 2009, the note of issue was filed. In July 2009, plaintiff and defendants made the instant motions for summary judgment, presently before the court.
*841 Plaintiffs Motion for Partial Summary Judgment
Plaintiffs motion for partial summary judgment, notice of which precedes by only one day (June 9, 2009) defendants’ notice of motion for partial summary judgment (June 10, 2009), seeks, inter alia, a judgment as to liability on its first cause of action for breach of contract, and dismissal of defendants’ first counterclaim, which also alleges breach of contract, based upon contractual language governing the owner’s termination of the contract, with which, plaintiff contends, defendants did not comply. Plaintiff properly relies upon the general rule that it is the role of the court to interpret the contract. Although defendants’ opposition to plaintiffs motion rests substantially on their claim that the contract is ambiguous regarding the critical provision for certification by the “Architect,” this court finds no such ambiguity. However, as to plaintiffs insistence that it is entitled to summary judgment on damages, conflicting representations of fact and insufficient documentation preclude such relief.
In moving for summary judgment on its first cause of action for breach of contract, plaintiff argues that JH breached the contract because it failed to fulfill the condition precedent of article 14.2.1 requiring it to obtain certification from the architect that sufficient cause existed to justify its termination. Plaintiff also argues that it is entitled to lost profits because of its wrongful termination. In seeking dismissal of defendants’ counterclaim, plaintiff contends defendants’ own breach of the contract precludes their recovery and, in any event, they sustained no damages.
Article 14.2.1 of the contract requires the “Architect” to certify the termination of the contractor. That section provides that “the Owner upon certification from the Architect that sufficient cause exists to justify such action, may . . . after giving the Contractor . . . seven (7) days written notice, terminate the employment of the Contractor. . . .”[10] Inserted alt the top of the first substantive page of the General Conditions incorporated *842 within the standard AIA contract is the following: “Where the word Architect is marked with *, it means the Architect of [sic] Engineer engaged by the owner. Where no asterisk is indicated, Architect means CPC’s Engineer.” (Exhibit 16 to plaintiffs notice of motion at D00043.) This provision is cross-referenced to article 15.1 of the General Conditions which defines the role of “CPC’s Engineer” “as an independent contractor [acting] solely on behalf of the Community Preservation Corporation” (at 00069). It is made clear that CPC’s engineer is not the “Professional [architect or engineer] of Record” and that the owner is required to retain its own architect or engineer to act on its behalf. Article 14.2.1, governing “Termination by the Owner,” requires certification of cause “from the Architect,” without an asterisk, and thus clearly requires certification of cause by CPC’s engineer. In any case, there is no evidence of certification of cause by either CPC’s engineer Streitfeld or by the architect of record, Gaskin of RCGA. Thus, the alleged ambiguity in the contract, upon which defendants rely in resisting plaintiffs motion for summary judgment on its first cause of action for breach of contract in improperly terminating plaintiff, is of no moment.
In opposition to plaintiff’s motion, defendants argue that because neither Streitfeld nor the CPC members present at the meeting of March 28, 2007 opposed JH’s desire to terminate plaintiff, compliance with “certification” should be inferred. In contrast, plaintiff cites the deposition of Mr. Streitfeld, who testified that he was not involved in plaintiffs termination; that he did not have any opinion as to whether or not plaintiff should have been terminated from the project; that he had never heard the reasons for plaintiffs termination; that he did not know if JH wanted plaintiff terminated; that he did not know “officially” if plaintiff had been terminated, but had “heard rumors to [that] effect”; and that he believed that HPD did not want plaintiff terminated because HPD “wanted the project to work.” (Streitfeld deposition of Mar. 31, 2009 at 134-136, exhibit 14 to plaintiffs notice of motion.)
*843 In addition, plaintiff points to the deposition of Robert W. Scarpa, Jr., the architect retained as an expert by JH. Mr. Scarpa testified that when Mr. Gutterman mentioned that he was considering terminating plaintiff, he advised Mr. Gutterman to “consult an attorney” and “have the architect certify a reason for termination.” Although Mr. Scarpa did not possess the contract at the time, and was uncertain as to the precise terms regarding termination, he testified that “in the standard American Institute of Architect[s’] contract, if a contractor is terminated for cause, typically the architect has to certify the reason why and that it’s justified” in writing. (Scarpa deposition of Mar. 30, 2009 at 16-18, exhibit 10 to plaintiffs notice of motion.)
In light of this testimony, notwithstanding defendants’ claims of contract ambiguity, which are rejected by this court, clearly there was no certification of cause by either Streitfeld or Gaskin in compliance with article 14.2.1 of the contract.
“Where a contract provides that a party must fulfill specific conditions precedent before it can terminate the agreement, those conditions are enforced as written and the party must comply with them” (Gulf Ins. Co. v Fidelity & Deposit Co. of Md., 16 Misc 3d 1116[A], 2007 NY Slip Op 51440[U], *4 [Sup Ct, NY County 2007], citing A. S. Rampell, Inc. v Hyster Co., 3 NY2d 369, 381-382 [1957]). Furthermore, “[t]his general rule fully applies to construction agreements, whose parties cannot terminate contractors unless they follow the contractual procedures to the letter” (Gulf Ins. Co., 2007 NY Slip Op 51440[U], *4, citing General Supply & Constr. Co. v Goelet, 241 NY 28, 35 [1925] [finding the owner had wrongfully rescinded its agreement with a contractor because it had not provided the architect’s certificate that the contract required]; MCK Bldg. Assoc. v St. Lawrence Univ., 301 AD2d 726, 727-728 [2003], lv denied 99 NY2d 651 [2003] [construction manager wrongfully terminated its agreement with subcontractor when it failed to provide 10 days’ notice, as contract required, and instead declared the termination effective immediately]; Paragon Restoration Group, Inc. v Cambridge Sq. Condominiums, 14 Misc 3d 1236[A], 2006 NY Slip Op 52579[U], *7 [Sup Ct, Erie County, May 11, 2006], affd in part, mod in part 42 AD3d 905 [2007] [owner breached article 14.2.2 of a standard ALA construction contract because the appropriate certification, notice and time to cure were conditions precedent to owner’s right to terminate *844 for cause, which it failed to fulfill];[11] see also Blumberg v Florence, 143 AD2d 380 [1988] [since the seller failed to comply with the condition precedent for cancellation of the contract, the seller’s attempted cancellation of the contract was ineffective]).
Here, plaintiff has made a prima facie showing that JH failed to terminate the contract in compliance with the contractual termination procedures. Defendants have failed to successfully refute plaintiff’s proof. Clearly, “[t]he termination of the contract . . . without the required previous notice [here seven days] and without a certificate from the architect in accordance with the terms of [article 14.2.1 of] the contract was wrongful” (General Supply & Constr. Co., 241 NY at 34). Article 3.4.1 of the contract requires:
“If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within seven days after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, after seven days following receipt by the Contractor of an additional written notice and without prejudice to any other remedy he may have, make good on such deficiencies” (emphasis added).
The termination letter sent to plaintiff by defendants merely states “[p]ursuant to Section 14.2 of the contract dated July 12, 2005 ... we hereby give notice of termination of your services effective seven (7) days from the receipt of this letter. Per the contract, you are not to return to the subject premises.” Despite *845 the delay of seven days in effecting the termination, plaintiff is given no notice of the reason for termination or the opportunity to correct any deficiency in performance. Even if, as defendants argue, the termination was based on exaggerated payment requisitions rather than defective work, plaintiff was entitled, under the contract, to be afforded an opportunity to remedy the problem. It is, after all, the determination by CPC’s engineer that the work did not correspond to the claim for payment that was the provocation for defendants’ decision to terminate. Moreover, had defendants complied with the requirement for certification by CPC’s engineer that cause for termination was present, plaintiff would at least have been on notice of the reason for termination and might have been able to remedy the problems found by Mr. Streitfeld in declining to accept plaintiffs representation as to the value of work performed.
Defendants failed to give plaintiff an opportunity to cure its allegedly defective or nonconforming work, and failed to provide the second written notice as required by article 3.4.1. The failure to comply with applicable notice and cure provisions in a contract bars recovery on a counterclaim based upon allegations of nonperformance (Northeast Constr Group, Inc. v Deconstruction, Inc., 16 AD3d 357 [2005]; Gulf Ins. Co., 2007 NY Slip Op 51440[U], *5; Paragon Restoration, 42 AD3d at 906 [“ ‘(w)here (defendant) elects to terminate for convenience . . . , whether with or without cause, it cannot counterclaim for the cost of curing any alleged default’ ” (quoting Tishman Constr. Corp. v City of New York, 228 AD2d 292, 293 [1st Dept 1996])]). In light of the cited authority, plaintiffs motion to dismiss defendants’ counterclaim for breach of contract is granted.
Accordingly, upon defendants’ failure to comply with the conditions precedent to termination contained in the contract, their termination of plaintiff breached the contract and plaintiff is entitled to partial summary judgment as to liability on its first cause of action against JH for breach of contract and dismissal of defendants’ first counterclaim. (Paragon Restoration, 42 AD3d at 906.)
Plaintiff further argues that it is entitled to $148,533, plus interest from March 16, 2007, in lost profits due to its wrongful termination since the contract states that this amount would have been its profit had it been permitted to fully perform. In opposition, defendants argue that plaintiffs damages, if any, are limited to the work completed and approved by CPC’s engineer under the amended terms of the contract which provide:
*846 “If, for any reason, funding of the building construction loan from CPC for the Premises is terminated, this Contract shall be terminated simultaneously and the sole liability of the Owner shall be to pay the Contractor for Work completed and approved by CPC’s engineer up to the time of such termination.” (Para 11 at D00017 of exhibit 16 to plaintiffs motion.)
Since CPC terminated the building construction loan in 2007, and the contract, by its terms, simultaneously terminated at that time, defendants argue that plaintiffs damages are limited to $8,787.15, which is the value of the work completed as approved by Mr. Streitfeld.[12]
“[I]t [is] well-settled law that a plaintiff has the right of electing, on the breach of a contract, to maintain an action on the contract for the work performed and the material supplied and for the damage flowing from the failure of the defendant to permit him to complete the contract, or ... to abandon any claim on or under the contract and to sue for quantum meruit for the work, labor and services and materials furnished.” (Paterno & Sons v Town of New Windsor, 43 AD2d 863, 864 [2d Dept 1974].)
Plaintiffs complaint contains claims for breach of contract, lien foreclosure and quantum meruit. The contract relates to three real properties, of which the instant action relates to only one. Thus, plaintiffs suggestion that it be awarded a sum certain, in what essentially would be liquidated damages, based upon a provision in the contract reciting anticipated profit to plaintiff for work on all three properties, is not valid. Moreover, the record reveals, and it is undisputed, that JH has already paid plaintiff $130,000 in two installments. Thus, plaintiff has failed to establish its entitlement to damages in the amount of $148,533.
Similarly, it would be improper, in light of defendants’ breach of the contract, to limit plaintiff’s recovery to the $8,787.15 advanced by CPC prior to the termination of the contract, particularly in light of plaintiff’s contentions that additional work was performed that fell outside the contract. (See In re Andrew Velez Constr., Inc., 373 BR 262, 279 [SD NY 2007].) The assessment of damages requires further factual development. *847 That portion of plaintiffs motion seeking summary judgment on damages is denied.
Finally, plaintiffs motion for judgment for attorney’s fees and costs is denied. Plaintiff has failed to cite any basis to support such relief. It is well settled that legal fees are not recoverable unless provided under the terms of a contract or authorized by statute (see U.S. Underwriters Ins. Co. v City Club Hotel, LLC, 3 NY3d 592, 597 [2004]).
Defendants’ Motion for Summary Judgment
Defendants’ motion for summary judgment seeks dismissal of the fifth cause of action brought pursuant to Lien Law article 3-A and dismissal of all claims against the individual defendants.[13] The sixth through tenth causes of action incorporate allegations of liability pursuant to Lien Law article 3-A as to the principals of JH and also seek to pierce the corporate veil as to the claims for breach of contract.
In support of the motion, Albert Tew, who appears to have acted as JH’s managing member in executing the various contracts, submitted his affidavit asserting that, notwithstanding the contradictory allegations that each of the defendant members “exercised total and exclusive domination over [JH]” and is therefore personally responsible for wrongful termination of plaintiff and the breach of the contract, “no one member dominated [JH].” Mr. Tew states that “[significant decisions, such as terminating [plaintiff], were collectively made after in-person meetings, email exchanges, or conference calls among the members” and that, although JH “may not have followed every corporate formality,” JH has always been adequately capitalized by its members, never paid a salary or the personal expenses of its members or applied its funds for personal use, and that JH’s assets have never been commingled with the personal assets of its members. Mr. Tew also contends that although JH did not have any income, it filed tax returns in 2005, 2006, and 2007 (and filed an extension for 2008). These representations, uncontradicted by any evidence from plaintiff, are corroborated by the bank records for JH’s account, including copies of checks and the tax returns.
Plaintiff responds that the individual defendants acted as the alter ego of JH, baldly contending that JH has been insolvent *848 since it filed its articles of organization on February 5, 2002, and unable to pay its debts to creditors since then. Specifically, plaintiff notes that JH failed to file tax returns from 2002 to 2005, that Mr. Tew concedes that JH earned no income since its formation, that Mr. Condi paid the New York City Department of Finance for the purchase of the properties, that the individual defendants posted the cash from their personal accounts to secure the building loan and pay for other related expenses, and that after JH opened the Commerce Bank account in November 2005, it remained insolvent, as evidenced by JH’s claim on its tax returns that it did not receive income during that relevant period. Curiously contending that defendants treated JH’s income as their own (in light of the claim that it had no income), plaintiff points to deposits totaling $59,196.20 by the individual defendants in order to ensure that JH was adequately capitalized, and that the tax returns indicate that JH had no income from 2005 to 2007. Plaintiff further argues that corporate formalities were not followed by JH, citing the failure to enter resolutions or proffer meeting minutes reflecting authorization to purchase the properties, obtain the building loan and mortgage from CPC, enter into the contract with plaintiff, hire RCGA as JH’s architect or to terminate plaintiff.
Based upon the payment of attorney’s fees and litigation costs from the company account, plaintiff claims that defendants’ Commerce Bank records demonstrate that the individual defendants used JH’s bank account to pay for their personal expenses and commingled their personal assets with the Commerce Bank account. Finally, in support of its efforts to pierce the corporate veil, plaintiff cites the fact that JH has no address, office, letterhead, telephone, fax or employees and that its members personally suffered damages as a result of the failure of the subject JH project.
Plaintiffs arguments are unconvincing. JH is a limited liability company, not a corporation, and the “formalities” required for its management, defined in an operating agreement among the members, are far more flexible than the rules applicable to a corporation. (See Limited Liability Company Law § 417.) The actions taken by Mr. Tew on behalf of JH were presumably authorized by the operating agreement[14] governing the company, and no separate “resolutions” would be required since the very purpose for the formation of JH was to enter the *849 contracts necessary to the development of the properties purchased from HPD. The chief executive of a business entity is presumed to have authority to enter into contracts in the ordinary course of that entity’s business. (Paragon Restoration Group, Inc. v Cambridge Sq. Condominiums, 14 Misc 3d 1236[A], 2006 NY Slip Op 52579[U] [2006].) Moreover, the capitalization of an LLC customarily derives from member contributions. It is noted that plaintiff does not reference any instance in which company funds were taken by any members, nor does it dispute, in any concrete way, the representation that no member received a personal benefit from the LLC.
The totality of the deposition and documentary evidence corroborates the defendants’ representations that decisions regarding management were made jointly and no single person dominated JH or was its alter ego. The fact that the company was managed from an office used by a member for other business as well is of no moment in light of the nature of JH’s business which was designed to further the purpose of the City of New York to develop multifamily housing, receiving most of its funding through government-affiliated programs. There would be no need for an independent place of business as the actual construction obviously took place at the site of the real properties. Although the payment of attorneys’ fees would not be a proper use of CPC funds (see contract, schedule I, exhibit B-3), the instant litigation is against JH and payment of the litigation costs out of company funds, which were not trust funds, was proper. There is no indication of a fraudulent or illegal purpose, nor are there allegations of fraud in the complaint. “General allegations that defendants entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim” (New York Univ. v Continental Ins. Co., 87 NY2d 308, 318 [1995]). “A cause of action for fraud does not arise when the only fraud charged relates to a breach of contract” (Tesoro Petroleum Corp. v Holborn Oil Co., 108 AD2d 607 [1985]).
“ ‘While the law permits the incorporation of a business for the very purpose of escaping personal liability . . . equity will intervene to pierce the corporate veil and permit the imposition of personal liability in order to avoid fraud or injustice’ ” (Shkolnik v Krutoy, 65 AD3d 1214, 1215 [2009], quoting Ventresca Realty Corp. v Houlihan, 28 AD3d 537 [2006] [internal quotation marks and citations omitted]). “A party seeking to pierce the corporate veil must establish that ‘(1) the owners exercised *850 complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiffs injury’ ” (Millennium Constr., LLC v Loupolover, 44 AD3d 1016, 1016 [2007], quoting Matter of Morris v New York State Dept. of Taxation & Fin., 82 NY2d 135, 141 [1993]). “[Precedent is clear that courts will pierce the corporate veil only to prevent fraud, illegality or to achieve equity. This is true even in situations . . . where the corporation is controlled or dominated by a single shareholder” (Treeline Mineola, LLC v Berg, 21 AD3d 1028, 1029 [2005] [citation omitted]). Plaintiff has failed to establish the elements necessary to pierce the veil of the LLC and hold the individual defendants personally liable for damages caused by JH’s breach of the contract.
However, the basis for plaintiffs claim of personal liability against the individual defendants rests also on Lien Law article 3-A, under which the principals of an entity found to have diverted trust funds may be held personally liable to the beneficiaries. (Atlas Bldg. Sys. v Rende, 236 AD2d 494, 495 [2d Dept 1997].) Thus, unless defendants prevail upon their motion to dismiss the fifth cause of action, their motion to dismiss the sixth through tenth causes of action must be denied.
Plaintiffs fifth cause of action alleging diversion of trust assets is premised upon CPC’s withholding of a total of $58,024.50 from advances on the loan from CPC as borrower’s equity and the use of the $8,787.15 advance, not paid to plaintiff, for purposes which plaintiff claims are not trust purposes. Defendants have moved for summary judgment dismissing this cause of action, claiming that the borrower’s equity withheld is not a trust asset and that the application of $8,787.15 to pay Ace Boring and the architectural firm RCGA was a proper application of these trust funds. Defendants further argue that they expended more than the trust funds received for trust purposes and could not, therefore, have diverted any trust funds. Defendants contend that they received $135,630.45 in trust funds from CPC, of which $130,000 ($83,000 + $47,000) was paid to plaintiff, leaving a trust fund balance of $5,557.45. Defendants further assert that the remaining payments they made totaled $12,615 ($10,000 to RCGA and $2,615 to Ace Boring), and that they therefore paid, from member contributions, $7,057.55 more to trust beneficiaries than they received from CPC ($12,615 - $5,557.45 = $7,057.55), concluding that there were no improper payments “from trusts funds or otherwise.”
*851 “Article 3-A of the Lien Law creates ‘trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction’ ” (Aspro Mech. Contr. v Fleet Bank, 1 NY3d 324, 328 [2004], quoting Caristo Constr. Corp. v Diners Fin. Corp., 21 NY2d 507, 512 [1968], and citing Lien Law §§ 70, 71). “These statutory provisions ‘were intended to insure that funds obtained for financing of an improvement of real property and moneys earned in the performance of a contract for either a privately owned improvement or a public improvement will in fact be used to pay the costs of that improvement’ ” (Canron Corp. v City of New York, 89 NY2d 147, 153-154 [1996], quoting 1959 Report of NY Law Rev Commn, at 209, reprinted in 1959 NY Legis Doc No. 65 [F], at 25, see also West-Fair Elec. Contrs. v Aetna Cas. & Sur. Co., 87 NY2d 148, 157-158 [1995]).
“To ensure this end, the Lien Law establishes that designated funds received by owners, contractors and subcontractors in connection with improvements of real property are trust assets and that a trust begins ‘when any asset thereof comes into existence, whether or not there shall be at that time any beneficiary of the trust’ ” (Aspro Mech. Contr., Inc., 1 NY3d at 328, quoting Lien Law § 70 [1], [3]; see also City of New York v Cross Bay Contr. Corp., 93 NY2d 14, 19 [1999]).
“It is settled law that only funds originating from one of the seven sources enumerated in Lien Law § 70 (5) qualify as owner trust funds” (In re Andrew Velez Constr., Inc., 373 BR 262, 280 [2007], citing Bristol, Litynski, Wojcik v Elliott, 107 Misc 2d 1005, 1006 [Sup Ct, Albany County 1981]). Specifically, Lien Law § 70 (5) provides:
“The assets of the trust of which the owner is trustee are the funds received by him and his rights of action for payment thereof
“(a) under a building loan contract;
“(b) under a building loan mortgage or a home improvement loan;
“(c) under a mortgage recorded subsequent to the commencement of the improvement and before the expiration of four months after completion of the improvement;
“(d) as consideration for a conveyance recorded subsequent to the commencement of the improve *852 ment and before the expiration of four months after the completion thereof;
“(e) as consideration for, or advances secured by, an assignment of rents . . .
“(f) as proceeds of any insurance payable because of the destruction of the improvement . . . except that the amount thereof required to reimburse the owner for premiums paid by him out of funds other than trust funds shall not be deemed part of the trust assets;
“(g) under an executory contract for the sale of real property and the improvement thereof by the construction of a building thereon.”
Lien Law § 71 (1) requires owner/trustees to apply such assets only for payment of the “cost of improvement” (Aspro Mech. Contr., Inc., 1 NY3d at 329).
“Cost of improvement is defined in the Lien Law to encompass ‘expenditures incurred by the owner in paying the claims of a contractor, an architect, engineer or surveyor, a subcontractor, laborer and materialman, arising out of the improvement . . . and shall also include . . . sums paid to discharge building loan mortgages whenever recorded’ ” (As-pro Mech. Contr., Inc., 1 NY3d at 329, quoting Lien Law § 2 [5]).
“The use of trust assets for a nontrust purpose— that is, a purpose outside the scope of the cost of improvement — is deemed ‘a diversion of trust assets, whether or not there are trust claims in existence at the time of the transaction, and if the diversion occurs by the voluntary act of the trustee or by his consent such act or consent is a breach of trust’ ” (Aspro Mech. Contr., Inc., 1 NY3d at 329, quoting Lien Law § 72; see also Canron Corp., 89 NY2d at 154, citing Lien Law § 72 [1] [“An improper diversion of the contractor’s trust assets occurs when any such trust asset is paid, transferred or applied for a nontrust purpose, that is, for any purpose other than the expenditures authorized in section 71 (2), before all of the trust claims have been paid or discharged”]).
Critical to defendants’ motion is the contention that the borrower’s equity deducted from the advances made to JH as loan proceeds do not constitute trust funds under the Lien Law, even *853 though any funds actually disbursed are conceded to be trust funds, because such sums withheld were not “received” by JH. While the language of the statute does specify that funds that are “received” by the owner for the improvement of the real property are trust assets, Lien Law § 70 also describes as a trust asset “of which the owner is trustee” a right of action for payment under a building loan contract. As the Court of Appeals explained in Matter of RLI Ins. Co., Sur. Div. v New York State Dept. of Labor (97 NY2d 256, 262 [2002]):
“As a matter of statutory construction and under our precedents, even before funds are ‘due or earned,’ they become assets of an article 3-A trust. . . .
“An article 3-A trust commences ‘when any asset thereof comes into existence’ and continues until all trust claims have been paid or discharged, or all assets have been applied for trust purposes (see Lien Law § 70 [3]; see also, Postner and Rubin, New York Construction Law Manual § 9.69, at 352-353). The trust is ‘broadly inclusive’ and consists of assets of every conceivable type arising from the work, including rights of action, as well as realized assets. . . .
“Section 70 (1) (a) thus ‘extend[s] the right of action as a trust asset to contingent, not fully matured rights to receive payment for work in progress’ ” (quoting Canron Corp. v City of New York, 89 NY2d 147, 157 [1996]).
Section 70 (1) of the Lien Law expressly provides that trust assets include funds “received by an owner for or in connection with an improvement of real property in this state,” and “[f]or the purposes of this section: (a) any right to receive payment at a future time shall be deemed a right of action therefor and an asset of the trust even though it is contingent upon performance or upon some other event.”
JH’s building loan mortgage from CPC entitled JH to receive a total of $1,225,000, upon compliance with the provisions of the building loan agreement which required, “as a condition precedent to any advances,” the payment of borrower’s equity (schedule I, exhibit 2 to Misir affidavit in opposition to defendants’ motion). Based upon the above language from RLI Insurance, the proceeds of the loan became trust assets upon execution of the documents. That portion of the loan proceeds withheld as borrower’s equity was part of the loan and *854 constituted trust assets even though payout was deferred until JH had satisfied its obligation to pay borrower’s equity by making payment directly to trust beneficiaries of those sums which were part of CPC’s approved advance, but were withheld. Presumably, if the project had been completed, CPC would ultimately have paid over to JH those sums withheld as borrower’s equity in the course of funding the construction as performed, after JH had satisfied its obligation to invest in the project by paying plaintiff and other trust beneficiaries for their contributions to construction out of its own funds.
In Canron Corp. v City of New York (89 NY2d 147 [1996]), the Court of Appeals found that the assignment of insurance proceeds, intended to cover the cost of repairs made by subcontractor plaintiff, to rent owed to the City by the general contractor constituted a diversion of trust assets in violation of article 3-A, notwithstanding that the funds were not actually delivered to the general contractor. Applying, by analogy, provisions of the tax code designed to prevent the avoidance of taxes by transfer of the right to compensation directly to a creditor, the Court found that the trustee had constructive possession of the trust assets, notwithstanding the absence of actual possession. (See also Aspro Mech., 1 NY3d 324, 330 [2004] [in which construction funds advanced to an owner by the New York City Housing Authority, which were assigned to the holder of the mortgage on the property, were found to be trust assets under article 3-A, though such funds never came into the owner’s possession but were paid directly to the bank. The Court found that the bank became “a statutory trustee” with a fiduciary duty to the trust beneficiaries].)
Similarly, by retaining sums otherwise payable to JH, CPC became a statutory trustee of the trust assets to which plaintiff would have been entitled and, simultaneously, because such funds were being retained upon the obligation of JH to supply the funds withheld, JH was actually in constructive possession of the funds. Accordingly, those funds retained by CPC as borrower’s equity are held to be trust assets to which trust beneficiaries are entitled. (See Colonial Sand & Stone Co. v United States of Am., 10 NY2d 271, 281 [1961].) However, from the total withheld, $58,024.50, must be deducted the sums paid by JH to plaintiff in excess of the advances received from CPC. To the first advance of $82,939.95, JH added $60.05, and to the second advance of $43,903.35, JH added $3,096.65. Thus, the funds constructively held by CPC as trust funds are reduced to $54,867.80.
*855 The authorities upon which defendants rely in arguing that an owner’s capital contribution is not a trust asset under the Lien Law, In re Andrew Velez Constr., Inc. (373 BR 262 [2007]), Pellic Dev. Corp. v Whitestone Equities Farmingdale Corp. (150 Misc 2d 939 [Sup Ct, Nassau County 1991], affd 199 AD2d 483 [2d Dept 1993]) and 237 Constr. Corp. v St. Stanislaus R.C. Church (30 Misc 2d 567 [Sup Ct, Queens County 1961]), are not dispositive of the issue here because the funds that are hereby found to be trust assets are not funds contributed by defendants but are funds that originated with CPC as loan proceeds which were withheld from payment because defendant JH had not met its obligation to provide borrower’s equity as its capital contribution. The funds alleged to be trust assets are not “Borrower’s Equity,” as defendants argue, but are loan proceeds under Lien Law § 70 (5). The authority cited to support defendants’ argument and, indeed, plaintiff’s concession (plaintiffs mem of law in opposition to defendants’ summary judgment motion at 13) that “a trust is created only when certain described moneys come into the hands of the owner” (Seaboard Sur. Co. v Massachusetts Bonding & Ins. Co., 17 AD2d 795 [1st Dept 1962]; see also Kingston Trust Co. v Catskill Land Corp., 43 AD2d 995 [3d Dept 1974]), in fact support the conclusion here that funds that are derived from a source listed in Lien Law § 70 are trust assets and may be reached by a beneficiary under the Lien Law when received. (See Seaboard.) Moreover, applying the more recent authority from the Court of Appeals, Canron (89 NY2d 147 [1996]), RLI Insurance (97 NY2d 256 [2002]) and Aspro Mechanical (1 NY3d 324 [2004]), the limitation that the funds must be in the actual possession of the trustee before a trust fund is created or diversion can be established has been superceded.
Having determined that the withheld loan proceeds are trust assets subject to Lien Law article 3-A protection, the remaining issue is whether it can be determined that the funds constructively possessed by defendants have been diverted. Defendants have submitted evidence of payments made to other trust beneficiaries for costs of improvement totaling $12,615 ($2,615 to Ace and $10,000 to RCGA) for which JH claims it is entitled to receive credit against the $54,867.80 constructively held by CPC and the $8,787.15 disbursed to JH which was not paid to plaintiff. Thus, under this argument, upon its article 3-A claim, plaintiff would be entitled to, at most, $51,039.95.
Plaintiff argues, however, that defendants’ payment to RCGA (their architect) and Ace Boring (their boring contractor) *856 for “soft cost” services they performed at the project cannot be treated as legitimate costs of improvement under Lien Law § 71 because the building loan allegedly prohibited defendants from using the CPC construction advances to pay for these costs and that doing so would constitute trust fund diversion. As it is not established that the boring contractor’s services were actually engineering services and therefore not a permitted application of loan proceeds under the building loan, this issue cannot be determined. As plaintiff itself argues, the bank records show that defendants used their own funds to pay for these costs. Plaintiff further notes that these payments were made before JH received the third advance from CPC of $8,787.15, arguing that such payments should not therefore be credited against trust assets subsequently received. However, as the trustee, JH had the “discretion as to who should be paid and how” (Teman Bros. v New York Plumbers’ Specialties Co., 109 Misc 2d 197, 201 [Sup Ct, NY County 1981]), and “ ‘the [Lien Law] expressly contemplates reimbursement to the owner for costs of improvement incurred prior to the date advances were received.’ ” (Fentron Architectural Metals Corp. v Solow, 101 Misc 2d 393, 396 [Sup Ct, NY County 1979].) But, the $8,787.15 advance of CPC funds actually made was subject to the restriction contained in the building loan, as are the CPC loan funds constructively possessed by defendants. The prohibition in the building loan against the use of CPC proceeds for architectural services would therefore apply and it is possible that there has been a diversion of the CPC loan funds to an impermissible purpose.
However, plaintiff’s contention that defendants’ failure to indicate in their Lien Law § 22 borrower’s affidavit that borrower’s equity would be deducted from the first 10 CPC advances, making these funds unavailable under the building loan to pay contractors who performed work at the project, and defendants’ failure to file a notice of lending under Lien Law § 73, indicating that borrower’s equity would be deducted from the construction advances, are evidence per se of defendants’ diversion of trust assets is without merit in the circumstances.
“Section 22 of the Lien Law . . . mandating] that all building loan contracts showing . . . the net amount available to the borrower for an improvement be filed in the office of the appropriate County Clerk ... is designed to enable a contractor or subcontractor to learn the amount available for a project prior to the delivery of contemplated ser *857 vices and materials.” (Pellic Dev. Corp., 150 Misc 2d at 946.)
Since plaintiff knew the contents of the building loan agreement in which the provision permitting satisfaction of defendant JH’s obligation to provide borrower’s equity as a contribution of owner’s capital to the first 10 advances of loan proceeds was recited, it cannot claim to have been prejudiced by such omissions. Moreover, assuming that the sums withheld by CPC would eventually be paid out and made available as trust assets, there is no misrepresentation in the borrower’s section 22 statement (see exhibit C to the building loan agreement, exhibit 6 to Misir affidavit in opposition). Although this statement does represent that no loan funds will be applied to, inter alia, architect’s and engineer’s fees, mortgage interest or legal fees, it does not, ipso facto, establish that trust funds not yet received in hand have been diverted to these purposes.
As to plaintiffs claim that defendants diverted trust funds to pay borrower’s equity because they did not file a notice of lending, as required by Lien Law § 73, such filing is not mandatory (Lien Law § 73 [3] [a]; Aspro Mech., 1 NY3d at 329 [“Trustees or lender-transferees may file a ‘Notice of Lending’ to ‘protect the lender’s right to repayment from trust funds’ ”]), nor does a notice of lending appear to be relevant to plaintiff’s interests.
Plaintiff further argues that defendants’ failure to maintain books and records of trust assets received as required by Lien Law § 75, and the consequent failure of defendants’ verified statements to comply with Lien Law § 76 (4), supports a finding that defendants diverted trust funds.
“Pursuant to Lien Law § 75 (4), the ‘[failure of the trustee to keep the books or records required by this section shall be presumptive evidence that the trustee has applied or consented to the application of trust funds actually received by him as money or an instrument for the payment of money for purposes other than a purpose of the trust’ ” (Medco Plumbing, Inc. v Sparrow Constr. Corp., 22 AD3d 647, 648 [2005], quoting Lien Law § 75 [4]).
While defendants do not dispute their failure to maintain books and records as required under the statute, defendants have sought to rebut the statutory presumption by producing evidence that they did not divert trust funds, but actually *858 paid all trust funds received to trust beneficiaries. As the evidence is incomplete, it would be premature to reach the conclusion that trust funds were actually diverted. The funds withheld were not paid by JH to CPC as borrower’s equity, as plaintiff contends, as borrower’s equity is the capital contribution of the owner and would not qualify as a trust asset. Thus, the mere fact that such sums were withheld does not establish diversion. Although defendants’ motion to dismiss the fifth and sixth through tenth causes of action must be denied, the court declines plaintiff’s invitation to, upon searching the record, grant plaintiff summary judgment on its claim of trust diversion.
Finally, defendants take issue with plaintiff’s failure to seek certification of a class of trust beneficiaries as required pursuant to Lien Law § 77 (1), arguing that such failure requires dismissal of the fifth cause of action. Plaintiff responds that such certification is unnecessary because it is the only member of the class. Plaintiffs contention is belied by the payments made to Ace and RCGA, indicating that there may indeed be other members of the class. However, the failure to obtain certification is not fatal to plaintiff’s cause of action under article 3-A so long as it is cured. (ADCO Elec. Corp. v McMahon, 38 AD3d 805, 807 [2d Dept 2007]; Brooklyn Navy Yard Dev. Corp. v J.M. Dennis Constr. Corp., 12 AD3d 630 [2d Dept 2004].) Plaintiff shall move to certify such class within 60 days of service of this decision and order. Until such certification occurs and other members of the class are identified, it cannot be determined whether defendants actually diverted trust assets since, as noted, there is evidence of payments made to trust beneficiaries other than plaintiff which may exceed the total of trust assets received, including those held constructively. (See In re Grosso, 9 BR 815, 827 [ND NY 1981] [no trust fund diversion claim where court found that “the amount properly going into the improvement equals the amount which, according to the building loan agreement, should go into the improvement”]; Fentron Architectural Metals Corp., 101 Misc 2d at 396 [no trust fund diversion claim where the owner’s expenses for the cost of improvement exceeded the proceeds from the loan, which constituted the trust fund].)
In summary, plaintiffs motion for partial summary judgment on its first cause of action for breach of contract is granted, as to liability only. The measure of damages is deferred pending *859 further litigation. That branch of its motion to dismiss defendants’ counterclaim for breach of contract is granted, and the remainder of its motion is denied. Defendants’ motion for summary judgment dismissing the fifth through tenth causes of action of plaintiffs complaint is denied.

. This date is set forth in the affidavit of defendant Tew, as well as in defendants’ material statement of facts submitted in support of defendants’ motion for summary judgment, although JH was not yet formed in September 2000.

. There are two separate, but parallel, actions pending before this court which involve the other two properties purchased by JH. Index No. 31033/07 involves the property located at 824 Friel Place and index No. 31036/07 involves the property located at 455 18th Street. The pleadings, moving papers and memoranda of law are substantially identical in each case except as to the property description and damages claimed and, as to index Nos. 31033/07 and 31036/07, plaintiff also seeks summary judgment as to JH’s second counterclaim alleging willful exaggeration of the mechanic’s lien.

. Plaintiff is designated the “General Contractor” in the building loan agreement with CPC.

. Susan Foresta, who negotiated the loan to JH on behalf of CPC, explained that a borrower, in addition to providing its equity contribution, was also required to post a letter of credit as “a fallback ... in the event [of] difficulties on the site.” JH actually posted $135,000 in cash in lieu of a letter of credit. (Foresta deposition of Mar. 31, 2009, at 15-26, exhibit 23 to Misir affidavit in opposition to defendants’ motion.)

. Plaintiff and defendants recited different numbers in their motion papers. In some cases the differences are the result of error and in some cases the result of using different calculations of the same items. These differences do not affect the discussion herein.

. The “Application and Certificate for Payment” indicates that the amount “Total Completed & Stored to Date” was $138,793 but that the “Current Payment Due” less “Retainage” [10% of completed work totaling $13,879] was $124,914.

. The contract, drafted by CPC’s “Supervising Engineer,” architect Ira Streitfeld, is actually a modification of AIA “Standard Form of Agreement Between Owner and Contractor Where the basis of payment is a STIPULATED SUM,” to which various addenda have been annexed.

. Exhibit R to defendants’ motion is the March 12, 2007 application for payment. It is not clear why plaintiff contends, in its counterstatement in opposition at paragraph 8, that this request was for $384,887. The discrepancies between plaintiff and defendants’ representations as to the precise sums demanded are not relevant to the instant motions as there is no dispute regarding the sums advanced by CPC and subsequently paid to plaintiff by JH. Plaintiffs contentions regarding the value of work actually completed raise questions of fact to be determined at trial.

. Plaintiff contends that CPC’s engineer approved its three payment requisitions “based on the work, exclusive of extra work, it had performed at the Project according to the Trade Payment Breakdown,” the contractual categorization valuing plaintiffs work and its cost. Plaintiff also states that the discrepancy between the amounts it requested and the amounts approved by CPC’s engineer represented the additional work it performed at JH’s request. Since this work was outside the scope of the contract between JH and plaintiff, JH, and not CPC, was responsible to pay for it.

. Article 14.2.1 provides, in pertinent part:
“If the Contractor is adjudged a bankrupt, or if he makes a general assignment for the benefit of his creditors, or if a receiver is appointed on account of his insolvency, or if he persistently or repeatedly refuses or fails ... to supply enough properly skilled workmen or proper materials, or if he fails to make prompt payment to subcontractors or for materials or labor, or persistently disregards laws . . . or is otherwise guilty of a substantial violation of a provision of the Contract Documents, then the Owner *842 upon certification from the Architect that sufficient cause exists to justify such action, may, without prejudice to any right or remedy and after giving the Contractor and his surety, if anyfj seven (7) days written notice, terminate the employment of the Contractor and take possession of the site and all materials . . . thereon owned by the Contractor and may finish the Work by whatever method he may deem expedient. In such case the Contractor shall not be entitled to receive any further payment until the Work is finished” (emphasis added).

. It should be noted that on appeal, the Appellate Division, Fourth Department, affirmed that branch of the order of the Supreme Court granting plaintiff summary judgment on its cause of action for breach of contract on the grounds that plaintiff had met its initial burden by establishing that defendant had terminated the contract without cause, pursuant to a termination for convenience clause (Paragon Restoration Group, Inc., 42 AD3d at 906) despite the fact that the Supreme Court had ruled that plaintiff had established as a matter of law that it was terminated in violation of article 14.2.2 of the contract, namely termination for cause (Paragon Restoration Group, Inc., 2006 NY Slip Op 52579[U], *6 [2006]) and that there was no evidence in the record that defendant terminated the contract under the termination for convenience cause (id. at *7). In any event, the Appellate Division affirmed that branch of the order which granted plaintiffs motion for summary judgment on its cause of action for breach of contract and modified that branch of the order which denied plaintiffs motion to dismiss defendants’ counterclaims to the extent of granting that branch of plaintiffs motion (Paragon Restoration Group, 42 AD3d at 906-907).

. In fact, Mr. Streitfeld approved $26,194.50 of plaintiffs third requisition, none of which was paid to plaintiff.

. Inasmuch as the pleadings missing from defendants’ motion papers were attached to plaintiff’s motion for partial summary judgment, the court will overlook this procedural flaw in defendants’ motion (General Motors Acceptance Corp. v Albany Water Bd., 187 AD2d 894, 895 [1992]).

. This document does not appear to be among the numerous exhibits provided to the court.